32          WISCONSIN REPORTS.

Goodall vs. The City of Milwaukee and others.

IRA E. GOODALL, Plaintiff in Error,

*vs.*

THE CITY OF MILWAUKEE, JAMES LUDINGTON, et al.,
Defendants in Error.

ERROR TO MILWAUKEE COUNTY COURT.

In 1847, the common council of the city of Milwaukee, passed an ordinance establishing permanently the grade of certain streets in the 4th Ward of said city, and provided that in case any person had theretofore or should thereafter erect any buildings, &c., fronting on said streets or either of them, the faith of the city was fully pledged that the grade should not be altered to the injury of such person, without the 4th Ward first making good all damages which might thereby accrue to such person; *held*, that the city was liable for damages caused by executing an ordinance of the common council passed in 1852, by which the grade was lowered some twenty or more feet, and by which buildings erected in reference to the former grade were rendered comparatively valueless.

THIS was an action of trespass on the case, brought by the plaintiff in error against the defendants in error, to recover damages for injuries done to his dwelling-house, lots and improvements by cutting down Sycamore street in the Fourth Ward in the city of Milwaukee.

The declaration, after setting out the plaintiff's title, proceeds as follows: "and for that, whereas, heretofore, to wit: on the eleventh day of November, A. D. 1847, at the city and county aforesaid, the mayor and aldermen of the city of Milwaukee, in common council assembled, did, by an ordinance, entitled 'An ordinance permanently regulating and establishing the grade of Wells, Spring, Sycamore, Clybourn, Hill, Hinman, Fifth, Sixth, Seventh and Eighth streets in the Fourth Ward of the city of Milwaukee,' and which ordinance was passed on the eleventh day of November, A. D. 1847, ordain and establish that the grade of the said streets, as reported by John B. Vliet, should be, and the same was adopted by the said mayor and aldermen of the city of Milwaukee, as the fixed and permanent grade of the streets mentioned in said ordinance; and it was in and by said

ordinance, further ordained and established, that in case any person or persons should at any time after said ordinance was in full force, purchase any real estate, or erect, move or alter any buildings, or make any improvement on any lot or part of lot fronting on either of the streets mentioned in said ordinance, the faith of the city of Milwaukee was pledged that the grade of said streets should not thereafter be changed or altered to the injury of any such person or persons, without the Fourth Ward of the city of Milwaukee first making good all damages which should thereby accrue to any such person or persons.

"And said plaintiff avers that in pursuance of said ordinance, said Sycamore street (being one of the streets mentioned in said ordinance) was graded, and the grade established as reported by John B. Vliet, and the same had been by said ordinance adopted by the mayor and aldermen of the said city of Milwaukee, and that in and by said ordinance, the said grade became and was the fixed and permanent grade of said streets.

" And said plaintiff avers that after the passage of said ordinance, and after the same was in full force and effect, he commenced to, and did improve said lots 5, 6, 7, 8, 9 and 10, in said block sixty-six, and which said lots front on said Sycamore street ; and laid out and expended large sums of money in building a dwelling-house, and in erecting the walls of his said house, and in placing a cellar under the same, and in fitting and accommodating the doors, windows and cellar, and every part of his said house, for the convenience and accommodation of himself and his family, as a place of residence, and erected a large barn upon the said lots, and ornamented and improved, and benefited the said lots by planting and setting out shade trees, shrubbery and plants, and in digging wells and making cisterns, and in fencing the said lots, otherwise greatly improving and ornamenting said lots, to make them comfortable and convenient for a residence for himself and family aforesaid, viz : at the county of Milwaukee, and to render the said house and premises valuable for the purpose intended, its doors, walls, windows, and all the improvements thereon, were all built, finished and improved with an express view to the grade of said Sycamore street. And

said plaintiff avers that afterward, to wit: on the 27th of February, A. D. 1854, and after said plaintiff had expended large sums of money in building said dwelling-house, and in ornamenting and improving of said lots, and in planting and setting out trees and shrubbery, and plants, and in making fences, digging wells, making cisterns and in building said barn, and after the passage of said ordinance, and after the same was in full force and virtue, and while the said plaintiff and his family were occupying and enjoying his said house and premises, the said defendants, the city of Milwaukee, and James Ludington, Daniel Schultz, and Alonzo L. Kane, street commissioners of the Fourth Ward of the city of Milwaukee, well knowing the premises, but contriving, and wrongfully and unjustly intending to injure, prejudice and aggrieve the said plaintiff in the use and enjoyment of his said dwelling-house and lots, changed and altered the grade of Sycamore street, and maliciously and without cause, dug up and carried away the stones, gravel and earth in said street, and graded down the said street to a great depth below the grade established by the ordinance aforesaid, to wit: to forty feet below said grade.

" And said plaintiff avers, that the Fourth Ward of the city of Milwaukee has not made good all the damages, or any part of the damages, which have accrued to him by reason of the change and alteration of said grade.

" By means of which said several premises he, the said plaintiff, has been greatly inconvenienced and disturbed in the use and enjoyment of his said dwelling-house and the said premises, and the walls of his house destroyed, and himself and his family deprived of the use of his said house as a residence, and has been compelled, at a great expense, to lower his barn, and his fences have become and are totally destroyed, and has sustained other great damages, to wit: to the amount of five thousand dollars, to wit: at said county of Milwaukee."

The second count in the declaration was substantially like the first. The third alleged the alteration of the grade of Sycamore Street to have been maliciously done to vex and injure, &c., the

plaintiff, which averment was entirely unsustained by proof. The defendants pleaded the general issue.

On the trial of the cause before the jury in the court below, the plaintiff below offered in evidence an ordinance of the city of Milwaukee, passed August 3, 1846, entitled "An ordinance regulating and establishing the grades of certain streets therein mentioned in the Fourth Ward of the city of Milwaukee," to the reading of which the defendants objected, for the reasons: 1. That the city council could not make such a contract; 2. Because the declaration is not upon contract, but in case; 3. There is no count in the declaration upon the ordinance, under which it can properly be read; but the objections were overruled by the court, and the evidence admitted; to which the defendants excepted. The ordinance is as follows:—

"Be it ordained by the mayor and aldermen of the city of Milwaukee, in common council assembled:—

"Sec. 1. That the grade of Sycamore and Clybourn streets, in the Fourth Ward of the city of Milwaukee, as reported by I. A. Lapham, engineer, the profiles of which are now on file in the office of the clerk of the common council, be and the same are hereby adopted and established as the grades of said streets.

"Sec. 2. And it is further ordained, that in case any person or persons shall, at any time after this ordinance is in full force and effect, erect any building or buildings, or make any improvements on any lots, or part of a lot, fronting on either of the streets above mentioned, the faith of the city of Milwaukee is hereby fully pledged, that the grade on either of the said streets shall not hereafter be changed or altered to the injury of any person or persons who may erect any building or buildings, or make any other improvements in accordance with said grade, without the Fourth Ward of the city of Milwaukee first making good all damage which may thereby accrue to any such person or persons.

"Passed August 3d, 1846."

The plaintiff also offered in evidence an ordinance of said city, passed November 11, 1847, which was objected to by the counsel for the defendants, for the same reasons as were assigned

in his objection to the introduction of the previous ordinance; which objection was overruled, and the defendants excepted.

It is not at all essential that the whole of the ordinance, which was read below, be inserted. The only portion of it bearing upon the case, material to be observed, is the following section:

" Sec. 5. And it is further ordained, that in case any person or persons have heretofore purchased any lots or parts of lots fronting on said streets, or erected, moved or altered any building or buildings, or made any improvements on any lot or parts of lots fronting on either of said streets, or in case any person or persons shall at any time after this ordinance is in full force and effect, purchase any real estate, or erect, move or alter any building or buildings, or make any improvements on any lot or parts of lots, fronting on either of the streets above mentioned, the faith of the city of Milwaukee is fully pledged that the grade of either of the said streets shall not hereafter be changed or altered to the injury of any such person or persons, without the Fourth Ward of the city of Milwaukee first making good all damages which may thereby accrue to any such person or persons."

The 10th and last section of the ordinance last aforesaid repealed the ordinance of 1846 by name, and " all other ordinances or parts of ordinances contravening the provisions of this ordinance."

After some further record evidence the plaintiff proved, by witnesses called upon the stand, that in conformity with a grade of Sycamore street, established in 1852, the street was cut down in front of the plaintiff's lots from twenty to thirty feet.

George W. Mygatt, an architect and builder, testified that he was architect and contractor for the building of the plaintiff's house on the lots described in the declaration. It was built in 1844-5. The present value of the house is about $3,000; that the cutting down of the street had nearly ruined the house; that there was danger of a portion of the building falling; that the house was only accessible from Sycamore street by a flight of stairs; there were also barn, cistern and other improvements; the barn had been let down about twenty feet. The cutting on

Sycamore street was about twelve feet from the south wall of the house.

The other defendants, besides the city of Milwaukee, were aldermen of the Fourth Ward and *ex-officio* street commissioners, under whose direction and supervision the street was graded.

There was considerable further evidence given by the plaintiff, sustaining all the material allegations in the declaration, except the averment of malice; and it was not contended that there was any express or special malice. After the evidence of the plaintiff was closed, the counsel for the defendants below moved the court for a peremptory nonsuit, for the following reasons :

1. There is no proof that the defendants have acted maliciously.

2. That the proof shows that what was done by the defendants was done in the exercise of legal authority to grade the streets in question, and although the plaintiff may have sustained an injury by such grading, the defendants are not liable.

3. That the plaintiff is not entitled to recover upon the case made in this suit.

The court below sustained the motion, and rendered judgment in favor of the defendants for costs, to which the plaintiff excepted, and has brought the case to this court by writ of error.

*Finch & Lynde*, for the plaintiff in error.

*H. L. Palmer*, for the defendants in error.

*By the Court*, SMITH, J. But for the circumscribed sphere or scope of the pleadings in this case, a wide, if not a new field of discussion would be opened up ; indeed, the argument on both sides at bar, as well as the authorities cited, seemed to have in view the widest scope, and the broadest range of inquiry which a subject of this kind could embrace ; but though, in the investigation of the case, we can scarcely avoid considering the more general principles applicable to the questions here involved, we shall endeavor (with what success is uncertain) to confine our-

selves as closely as may be to the precise questions presented by the pleadings and proof.

There is no doubt that the constitutional inhibitions upon the legislative power in this country, in favor of the protection and security of the individual citizen or person in his rights of property, however consonant with natural justice, constitute a peculiar feature of American legislation and jurisprudence. In England, the Parliament is said to be supreme, omnipotent, and to its mandates the highest, as well as the lowest, in all their rights and acquisitions must yield. Not so here; all departments of government derive their powers from the prescribed consent of the people who are governed. In all of the states of the Union, as well as in the fundamental federal compact, limits are fixed to each department of the government, and especial care is taken to protect and secure the individual citizen against the rapacity, corruption or heedlessness of public functionaries, in all of the spheres wherein they may be called to act.

Here, in this country, the legislature is not omnipotent, but is hedged about by those constitutional inhibitions which the executive and judiciary are bound to regard and enforce, should the former become unmindful of their operative power upon the contemplated enactment.

In this country we are not compelled to look to the purview of a statute to ascertain whether or not provision is made for compensation for private property taken, or authorized to be taken for public use, but every citizen is assured by the fundamental law, that his property is safe from aggression unless compensation is provided for in the act which authorizes its seizure, or that the act in that respect is null and void. Therefore, the question here is not whether an act of the legislature, which authorizes the taking of private property for public use, has provided compensation for the property so taken, in order to determine the right of the person whose property is taken, to compensation, because the fundamental law secures him against all such enactments, and renders them void or inoperative unless compensation be provided for, and can afford no immunity to

the person or persons, artificial or natural, municipal or private, acting in conformity therewith.

It is a matter of some surprise that there is so little direct authority. upon the question as to what shall be considered a taking of property for public use. Is the constitutional inhibition restricted to the actual, manual taking and appropriation of the constituent material of the property to the public use? or, does it extend to all the natural rights, incidents and uses of the property as nature disposed, fixed and adapted them?

Upon this subject there is some confusion, or rather want of specification and demarkation in the books. In the case of *Lasala vs. Holbrook* (4 *Paige*, 169), Chancellor Walworth says: "I have a natural right to the use of my land in the situation in which it was placed by nature, surrounded and protected by the soil of the adjacent lots; and the owners of those lots will not be permitted to destroy my land by removing this natural support or barrier." But is not the right of access to my lot, in the situation in which it was placed by nature, over adjacent soil, as much my right to the enjoyment of my own lot, as is the right of lateral support and protection? Am I bound, when I purchase my lots, to take into view all the whims or caprices, the suggestions of speculation or malice that may, perchance, seize upon and distort the judgment of municipal functionaries? or to measure the wants or conveniences of other lot owners to be promoted by artificial means? Or, may I rely upon their natural form, situation and advantages, leaving to others to do the same, and feel safe under the shield of the constitution? In other words, may I purchase property with all its natural advantages of form, location and surroundings, and rest secure that those advantageous appurtenances and incidents shall not be taken from me unless the public necessity shall so require, and then only upon compensation?

The question under consideration in this case is not one of adjacent lot owners and their respective rights. We are not called upon to decide to what extent one lot owner may alter, modify or excavate his own lot without infringing upon the rights of his adjacent lot owner; nor to define, limit or apply at

this time the legal maxim, *sic utere tuo, ut alienum non lœdas;* because this maxim is not applicable here. Hence many of the cases cited and commented upon in the argument, fail to elucidate the precise rights and powers of the parties now before the court.

For the present we shall not speak of the individual defendants herein made parties, but our remarks are intended to apply to the principal defendant, the city of Milwaukee. Nor is it deemed necessary now to discuss the question, whether a municipal corporation may be liable to an action for an abuse or excess of its powers?

It would seem that there is a very great distinction to be observed between a case arising out of the conflicting claims of individual adjacent lot owners, and a case arising out of the claims of the lot owner on the one hand, and a municipal corporation having control of adjacent streets and alleys on the other. The individual owner has the exclusive control and dominion over his own lot, subject only to lawful restraints imposed by the sovereign state. The corporation has control of the lands appropriated for the purpose of a street, as a trustee for such purpose only. The individual may use his own land for such purpose as he may choose, within the restrictions before referred to, but the corporate authorities can use the lands designated as streets, &c., for such purpose and for no other.

On the laying out, platting and recording of the village of Milwaukee, "the lands intended to be for streets, alleys, ways, commons or other public uses," were held in the corporate name of said village, "for the uses and purposes set forth and expressed or intended," viz : for a street, alley, common or other public use, and for no other use or purpose whatever. *O. Rev. Stat. p.* 160, § 5 ; *Rev. Stat. chap.* 41, § 5. The statute existing at the time of the laying out and recording the village of Milwaukee differs in no essential respect from those above cited. By this section, the same in the old as in the new statute, the acts of platting, acknowledging, &c., are made to operate as a grant of the lands designated on the map or plat as streets, &c., to the corporate authorities of the village, town or city, as trus-

tees for the uses and purposes thereby set forth, expressed and intended, and for no other use or purpose whatsoever.

By this provision of law the city of Milwaukee became the grantee of certain lands designated on the plat thereof as streets, and for such use and purpose only.

Though, as in the case of *Thurston vs. Hancock* (12 *Mass.* 220), and in the case of *Lasalla vs. Holbrook* (4 *Paige*, 161), an individual adjoining lot owner may, perhaps, dig or excavate his own lot for the purpose of laying a foundation for the improvement thereof, and thereby endanger the building of his neighbor, it will hardly be contended that the corporate authorities of the city, holding adjacent lands in trust for the sole and exclusive purposes of a street, could do the same thing. It is apparent that the power and dominion of the latter are much more restricted, and must be exercised with a single view to the objects and purposes of the trust. The latter estate is merely an easement—the right of passage over and along the land, while that of the former is complete and absolute from the surface to the centre.

Nor must the fact be lost sight of, that this is a public trust—that the use is a public use; and although the specific land for that purpose is voluntarily donated by private persons, yet the use thereof is public, and all collateral aids thereto are for public use.

In the case of *Kimball vs. The City of Kenosha* (4 *Wis. Rep.* 321), this court held that, though the fee (qualified) of the land designated as streets upon recorded town plats might, by statute, be placed in the corporate authorities, yet the lot owners took to the centre of such street, subject to such public easement. It would seem, therefore, that there must necessarily be observed a distinction between the facts and principles applicable to individual private adjacent land owners, in respect to the use which they may make of their respective lots, and the extent of their dominion, and that of municipal corporations in respect of lands donated or appropriated exclusively for the purposes of public streets. The extent of the estate in the corporation is in the use of the land as a public street. All else pertaining thereto, to

the centre of the earth, belongs to the adjacent owners. The estate in the lands is essentially one of trust, and the powers of the trustee over the lands derived from title is limited by the nature and objects of the trust.

But it is claimed and admitted, that the city of Milwaukee has other powers in relation to the regulation and grading of streets, than those derived from title, viz : those conferred by the charter or act of incorporation. But these latter powers must not be confounded with those derived from title merely. The latter is an incident of ownership, the former is a delegation of power by the state. The one is the dominion of the proprietor; the other is the dominion of the sovereign. To the one, the maxim *sic utere tuo, ut alienum non lædas*, applies with more or less force; to the other, the constitutional inhibition for the protection of private property is the only restraint within scope of the charter.

And here the question first suggested recurs, upon which the whole case of course hinges, whether the power derived from title merely is a full and complete defence to every complaint for the use made of the lands aforesaid (to which the same have been subjected), or whether such use, in the manner alleged, is authorized by the charter of said city.

It will be borne in mind that most of the authorities cited by the defendants in error are based upon the fact of title in the corporation or persons against whom the complaint has been made, or action has been brought. In the case of *Radcliff's Exrs. vs. The Mayor, &c., of Brooklyn,* the case upon which the strongest reliance is placed by the defendants, Chief Justice Bronson, who delivered the opinion of the court, seems to base his whole argument and decision upon the title of the defendants, and the authorities upon which he appears to rely are of a similar character. He says: "In leveling and grading the street, they (the defendants) were *at work in their own land,* doing a lawful act for a lawful purpose." Indeed, almost, if not his entire argument, is based upon the fact that the corporation of the city of Brooklyn owned the soil of the street and could use such land as a private owner could his own. He refers, it is true, to the power granted by the charter to grade the streets. He does not seem

to rely upon it, but alludes to it in connection with the fact that, though such power is amply given, no compensation is made for consequential damages resulting from the exercise of such power. *Radcliff's Exrs. vs. The Mayor, &c., of the City of Brooklyn*, 4 *Comst. R.* 195.

We have before observed that the title of lots bounded by streets in a city, or recorded town plat, extended to the centre of such streets, subject to the public easement. The owner of such lots has the same right of passing and repassing over such streets, to and from his lots, as the public have; and it may well be asked, whether such right can be impaired or destroyed, his lot rendered inaccessible, by means of altering the street over which it was before accessible, without making compensation? The interest or right of the lot owner in the highways or streets leading to and bounding his lot, is such that he may maintain an action for obstructing them, and he is entitled to damages, if any he sustains, for discontinuing them. *Stetson vs. Faxon*, 19 *Pick.* 147; *Coke Litt.* 56 a.

In the case of *Baron et al. vs. Baltimore* (2 *Amer. Jurist*, 203), the plaintiffs owned a wharf in the harbor of Baltimore, and the city authorities of Baltimore diverted certain streams of water to a point near the plaintiff's wharf, causing quantities of sand and earth to be carried down and deposited, thereby lessening the depth of water at the wharf, so as materially to impair its value. It was contended by the defendants that they were a public corporation, "acting within the scope of their authority, upon advice, with due care and circumspection." But the court held that though the defendants were acting within the scope of their authority, and though it were a measure beneficial to the city, yet they should not carry it into effect without compensating the individuals whose property was thereby sacrificed. Here was no manual taking of the plaintiff's property, no appropriation of the constituent material; on the contrary, the injury was purely consequential, and upon the doctrine laid down in *Radcliff's Exrs. vs. The Mayor of Brooklyn*, would be "*damnum absque injuria*." But Chief Justice Archer, in the case above cited, says: "The defendants (the corporation) are trustees

of public interests for their own benefit, and ought to answer as an individual *to the person at whose expense they are benefited.*".

In *Thayer vs. Boston* (19 *Pick.* 511), the defendants contended that they were a public corporation, acting within the scope of their authority, for a lawful purpose, and in a lawful manner, and if any individual was injured thereby, it was *damnum absque injuria.* But Chief Justice Shaw, in giving the opinion of the court, said that " this argument, if pressed to all its consequences, and made the foundation of an inflexible practical rule, would often lead to very unjust results," and denied the doctrine, that corporations could not be held liable for consequential damages. In that case the city had appropriated to other uses, a certain town way on which the plaintiff's lot abutted, and the city was held liable to an action. The chief justice further says : " If it was done by officers having competent authority, either by express vote of the city government, or by the nature of the duties and functions with which they are charged by their offices to act upon the general subject matter, and especially if the act was done with an honest view to obtain for the public some lawful benefit or advantage, reason and justice obviously require that the city in its corporate capacity should make good the damages sustained by an individual in consequence of the acts thus done ;" and in *Stetson vs. Faxon* (19 *Pick.* 147), that same court say : " Let the city take all that is necessary, convenient and becoming this great and flourishing capital, but let compensation go hand in hand with the public benefit." It is submitted whether the principles here uttered are more in accordance with natural justice, sound public morals and enlightened policy, or the application of the griping maxim, " *damnum absque injuria,*" so earnestly contended for in the case of *Radcliff's Exrs. vs. Brooklyn.*

This same question was distinctly before the court in *Rhodes vs. The City of Cleveland* (10 *Ohio Rep.* 159), in which the city was held liable for damages resulting from the grading of the streets, though acting within the scope of their powers. The same doctrine was re-asserted in *McCombs vs. Akron* (15 *Ohio Rep.*), after full consideration; and again in 18 *Ohio Rep.* the same case was again brought before the court on a writ of error ·

allowed as was alleged for the purpose of again reviewing the former decision, when the doctrine was re-affirmed and fully established as the settled law of that state. *See Leader- vs. Maxon,* 3 *Wilson,* 461 ; 2 *Wm. Blackstone,* 924, *and cases cited in note ; Alleghany vs. Rowley et al.,* 2 *Am. L. Jour.* 307 ; *Combs vs. Pittsburgh,* 18 *Penn. Rep.* 187.

It is not intended to comment upon the many English cases cited by counsel, because they furnish little if any authority in this country, where private property is protected and secured from public appropriation without compensation, by the written fundamental and paramount law which must control our jurisprudence, as it does in like degree and force our legislation, as well as administration, and where the right to compensation depends, in no degree, upon legislative provision.

It may well be asked, in view of the principles sustained by the authorities and reasoning before cited, what is the difference in principle, in equity, or in the rules of construction, between the case where the property of an individual is *taken* for public use, and the case where the property of an individual is *sacrificed* or rendered worthless, as the direct consequence of contiguous operations, designed and carried on for the benefit of the public?

It was said in the argument, and it was repeated over and over in the reasoning of the authorities cited, that the public good is the paramount good, &c. ; and so, with certain qualifications, it is. It is necessary and proper that the corporate authorities of a township or city should have the right to regulate streets, and to devise and execute public improvements. But, in the language of Chief Justice Shaw, "let the city take all that is necessary and becoming this great and flourishing metropolis, but let compensation go hand in hand with the public benefit." Is it right or just, that in order to accomplish a great public good, or carry on a great public improvement, the several individuals whose property may be destroyed or rendered comparatively worthless, though not literally *taken* and appropriated in the accomplishment thereof, should be compelled to sustain the whole loss occasioned thereby? If the public good or con-

venience requires that the grade of a street shall be lowered to such a plane as to destroy the use of the lots of one or two men, whether is it more in accordance with natural justice or sound public morality, that the public, for whose benefit the improvement is made, should bear an equitable apportionment of the partial injury resulting therefrom; or that one or two citizens, whose property is thus destroyed or injured for the public convenience and benefit, should sustain or suffer the whole loss? The spontaneous suggestion of every enlightened conscience answers the question. It is at once suggested to every mind, as was remarked by Chancellor Walworth, " that every person has a natural right to the use of his own land in the situation in which it was placed by nature, surrounded and protected by the soil of the adjacent lots;" and if this right is infringed for the public benefit, is not the owner as much entitled to compensation as though the soil itself were appropriated?

I will not, myself, venture to question the correctness of the decision in the case of *Thurston vs. Hancock* (12 *Mass. Rep.* 220), but other and far abler jurists have done so, and surely I may be permitted to say that it appears to me utterly irreconcilable with other decisions rendered by that same enlightened court. I am not aware that it has ever been brought directly under review in an analogous case, but the correctness of the ruling in that case has been very seriously disputed by other courts. *Farrard vs. Marshall,* 19 *Barb. S. C. R.* 380. But whether correctly decided or not, it was a case between individual adjoining land owners, each holding the fee simple of the soil. There was no taking, appropriating, sacrificing or destroying, or even injuring of property for *public* use or benefit. It was a contest between individual owners as to their respective rights in, and dominion over the soil. Very different is the case where the convenience of the public requires the sacrifice or destruction of one man's property; where the public derive all the benefit, and demand it at the unrequited expense of those who may chance to suffer by the operation.

It is cheerfully admitted that private tastes, notions and interests must and ought to yield to the public welfare; but it is

insisted that the public, who demand the sacrifice, ought, in equitably ratable proportions, to share the expense of procuring the victim. If the public interest requires a grade to be made which changes the situation of lands as they were placed by nature, is it not just that the public, for whose benefit the lands of individuals may be seriously damaged thereby, should, in ratable proportions, contribute in compensation for the damage thus sustained? Is there any substantial difference whether the sand or gravel on my elevated land is taken to construct an embankment, or fill up a depression below, or whether the sand and gravel in the streets around my lot are taken to fill the same or another street below, and thereby render my lot wholly inaccessible and worthless? In both cases the public interest is subserved, and in both cases individual property is either taken or sacrificed as the direct consequence of the operation. The policy of the law, in permitting it, is based upon the subserviency of private to public interests. But the policy of the law is equally designed to protect private property from uncompensated appropriation or destruction, where the public welfare seems to demand its use or destruction.

It is insisted by the defendants that the street is not graded up to the line of the plaintiff's lots. We have been speaking however of the case as though the street was graded according to the profile its whole length, for this is the extent of the principle contended for, and the extent of the doctrine asserted in *Radcliff's Exrs. vs. Brooklyn*, and we presume it is desirable that we shall so consider it in the discussion of the principles to be applied in its determination. How the jury might find upon the evidence here were it submitted to them, is at present immaterial to the principal question under consideration.

As however the whole court are not unanimous in the views hereinbefore expressed, we do not place the decision of this case wholly upon the grounds before suggested, and this line of argument will be pursued no further. We have thought it our duty to say thus much, in justice to the counsel who have so ably presented and argued these points, in justice to the parties so deeply interested in the rule of decision ultimately to be

adopted, and in justice to ourselves, that we might not appear to have evaded a question of such great intricacy, magnitude and importance.

It appears that the grade of Sycamore street, on which the lots of the plaintiff below abut, was first established in 1844, under the village charter; that it was changed in 1846, and again established in 1847; and in 1852 a new grade was ordered, by which the street was cut down some twenty feet below the former grade.

It appears that in 1846, the common council of the city of Milwaukee passed an ordinance fixing the grade of Sycamore, among other streets. By that ordinance it was provided, among other things, as follows:

"Sec. 2. And it is further ordained that in case any person or persons shall at any time after this ordinance is in full force and effect, erect any building or buildings or make any improvements on any lots, or part of a lot, fronting on either of the streets above mentioned, the faith of the city of Milwaukee is hereby fully pledged that the grade on either of the said streets shall not hereafter be changed or altered to the injury of any person or persons who may erect any building or buildings, or make any other improvements in accordance with said grade, without the Fourth Ward of the city of Milwaukee first making good all damage which may thereby accrue to any such person or persons.

"Passed August 3d, 1846."

Again, in November, 1847, the common council of the city, passed another ordinance, " to establish permanently " the grade of said Sycamore street, among others; by which ordinance it was provided and ordained as follows:

"Sec. 5. And it is further ordained, that in case any person or persons have heretofore purchased any lots, or parts of lots fronting on said streets, or erected, moved or altered any building or buildings, or made any improvements on any lots or parts of lots fronting on either of said streets, or in case any person or persons shall at any time after this ordinance is in full force and effect, purchase any real estate, or erect, move or alter any

building or buildings, or make any improvements on any lot or part of lots, fronting on either of the streets above mentioned, the faith of the city of Milwaukee is fully pledged, that the grade of either of the said streets shall not hereafter be changed or altered to the injury of any such person or persons, without the Fourth Ward of the city of Milwaukee first making good all damages which may thereby accrue to any such person or persons."

Previous to the passage of these ordinances, however, there was passed an act of the territorial legislature, approved February 17, 1842, entitled " An act to change the corporate limits of the town of Milwaukee," by which there was granted to the trustees of said town, ample power " to cause any alley, street, lane or highway to be graded, leveled, paved or repaired," &c., thus conferring upon said corporation the usual powers of regulation and control, over the several streets of the (then) village of Milwaukee. So far as our present inquiry is concerned, the act of 1852 does not materially concern us.

By virtue of these several acts, and the ordinances of the town and city authorities passed under them, it is contended on the part of the plaintiff in error, that the grade of Sycamore street, on which the lots of the plaintiff are situated, was so fixed and established that the same could not be altered without making compensation to the persons who might be injured by such alteration.

On the part of the defendants in error, it is contended that their power to grade the streets is a continuing power, not exhausted by one exercise of it, but is vested in the legislative authority of the corporation, to be used and exercised from time to time, as occasion shall seem to require, to promote the public good or convenience.

It is further contended by the defendants in error, that this power to grade the streets was vested in the common council, to be by them exercised for the public benefit, and that the several city or town ordinances, so far as they assume to abridge, limit or barter away the authority thus conferred by the legis-

lature, are utterly void, and that the defendants are not estopped from denying the validity of such ordinances in that behalf.

Several authorities are cited to sustain these positions, some of which we propose briefly to examine. The first case cited to this point is *Gozzler vs. Georgetown* (6 *Wheat.* 593). In this case it is apparent that the venerable Chief Justice Marshall lays considerable stress upon the phraseology or verbiage of the act conferring legislative power upon the trustees or town council, as they are indifferently called, of Georgetown. But it is not deemed essential to enter into the verbal criticisms upon the various acts of the legislature involved in the question, because we prefer to place it upon the general principle applicable to general cases of this kind. In the case cited, the question was whether the corporation could abrogate, or divest themselves of the power of altering the grade of streets, having once exercised it. The court very properly held that the power could not be abjured. The corporate authorities were the mere trustees of the public. Having fixed the grade of a certain street, it was proposed to change it after valuable improvements had been made in reference to the former grade, which had been declared permanent and unalterable. The sole question presented to the court for decision was one of power on the part of the legislative authority of the town. There was no question of damages or compensation in case the power was exercised. The application was for an injunction to prevent its exercise at all; to restrain perpetually the corporation from altering the grade of the street from the plane on which it had been established. The court held that the power remained where the legislature had deposited it. But it was by no means held that compensation could not be recovered for an injury resulting from such an alteration.

In the case of *Fairtitle vs. Gilbert et al.* (2 *D. & E.* 169), the question before the court was in regard to the power of a turnpike company to mortgage their toll-houses, toll gates, &c., and it was held that the company had no such power to mortgage such property, thereby giving a priority among creditors in contravention of the act of Parliament from which all their authority

was derived, and that they were not estopped by their deed from insisting upon such want of power.

The case of *Coates vs. The Mayor of New York*, was one having reference to the power of the common council, under various acts of the legislature of the state, to prevent the interment of the dead within the limits of the city. The right of interment was based upon grants of, or titles to, land holden in trust for the sole purpose of interment of the dead; and it was held, that a by-law or ordinance of the city prohibiting such interment was not unconstitutional, either as impairing the obligation of the contract or grant, or as taking private property for public use without compensation, and the decision was based upon the ground of the authority of the corporation to make police regulations in respect of public nuisances. It is not to be contended for a moment that the common council of the city can, by contract, ordinance, or otherwise, divest themselves of the power to prevent and abate nuisances. Nor is it pretended that they can make any agreement or compact by which their power to abate nuisances which may become such in the future, may be annulled, abrogated, or impaired. But the power under consideration in the case at bar has nothing to do with the police power referred to in the case last cited. The defendants do not justify under any such power. Neither the plaintiff's lots nor the street were declared nuisances, nor was the grade changed to prevent or abate a nuisance.

The case of *Martin vs. Brooklyn* (1 *Hill*, 545), presents the case of a mere private arrangement between individuals and officers of the corporation, made without consideration and hence inoperative, or *nudum pactum*, but has no bearing upon the question now before us.

We have most carefully examined all of the cases cited by the counsel for the defendants in error, and have stated above the points in judgment determined by those deemed most pertinent and material to our present inquiry. Nor have we been satisfied with an examination of those authorities which have been cited upon the argument, but have searched for all the light which elementary treatises, monographs and reported adjudications

within our reach could furnish, and in the main we find ourselves thrown back upon those primary principles of law and justice, long established and approved by the universal conscience of mankind.

The system of England is so different in many respects from that adopted in most of the states of the Union, that the adjudicated cases of that country furnish but little aid in determining the question here involved.

The legislature in 1842 (*Sess. L.* 1842, *p.* 37), gave to the trustees of the village of Milwaukee, power "to cause any alley, street, lane or highway in said town to be graded, leveled, paved or repaired," &c. This power, or one similar, has been continued by repeated amendatory acts, up to the time of the passage of, and including the act of 1852, under the authority of which the grading was done, from which the alleged injury resulted.

Under the provisions of these several acts of the legislature, we are unable to find any such limit or restriction of authority as that contended for by the counsel for the defendants in error. To admit this doctrine, would be to admit, that while the city authorities have ample, nay, almost plenary power over the streets, they may, by solemn ordinance and compact, fix permanently the grade of a street, and thereby declare that whosoever will grade his lots and erect his buildings in reference thereto, shall not be disturbed or injured by a change of the grade of the street without full compensation being made him, yet after the citizen shall have expended hundreds and thousands of dollars, relying upon the faith of the city thus pledged, the common council may with impunity violate its most solemn enactments, change however capriciously or disastrously, the grade of the street so improved, even to the utter ruin of the citizen who has relied upon their faith. It is difficult to conceive of a "rule of action" more destructive of private property, more utterly incompatible with sound morality and public faith, pledged in all the forms from which it derives respect, confidence and (if possible) sanction.

We admit, even as all the cases cited tend to establish, the

*power* of the city to change the grade of the streets. But we are not here considering the question of power. The plaintiff in error does not seek to restrain the defendants from the exercise of the power. But he has acted upon the ordinance of the city, by which its faith was pledged. The city did not engage that they would not exercise the power which they had of altering the grade of Sycamore street; but they declared that if they did so again, so as to injure any one, they would make good all damages sustained in consequence thereof, and solemnly pledged the faith of the city to that end. Let that faith be preserved inviolable if it would challenge credence. If it be not, let the sanctions of the law put spur to the public conscience.

It will be borne in mind, that neither in the ordinance of 1846, nor in that of 1847, was there any abandonment of the power on the part of the corporation to alter or regulate the grade of streets. The common council only declared, that if the lot owners would only improve and build upon their lots in reference to the grade established by those ordinances, in such case, though they would not relinquish the power to alter the grade, if, in their judgment, the public interest required it, the damage occasioned thereby should be made good by the public for whose benefit the alteration should be made. This, it appears to us, was eminently just and equitable, and we have failed to discover in this case any one of those stern rules of law which occasionally may intervene between the demands and the administration of justice.

The consequences upon public enterprise or improvement which would flow from holding municipal corporations liable for consequential damages, resulting from the various schemes of municipal progress, have no bearing upon the principle on which we base our decision in this case, and we shall not therefore, respond to arguments thereby suggested. When that question can legitimately arise and be presented for adjudication, it may be well enough for the proper authority to consider whether protection or indemnity can be lawfully claimed by a person who, with a view to accommodate his surface to the established grade of the street, has laid his foundation some ten

feet below the natural surface, and yet it is deemed necessary to excavate the street some twenty feet deeper, and it is so done for the benefit of the public, but to the ruin of the property of such person ; and all this after the most solemn guaranty which the city authorities could give, of permanency in reference to the former grade, and of security in making improvements upon the faith of such guaranty. After making these compacts on the part of the city, and having been acted upon by the citizens, does not sound law, as well as public morals, and true political economy, demand the observance of the faith so pledged ? We think so. We also think it was competent for the common council to pass the ordinance of 1846 and 1847, and having been executed and acted upon, they must be held obligatory upon the city.

The judgment of the Circuit Court is reversed, and a *venire de novo* awarded.