# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP146 |
| COMPLETE TITLE: | Wisconsin Carry, Inc. and Thomas Waltz, Petitioners-Appellants-Petitioners, v. City of Madison, Respondent-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | March 7, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Ellen K. Berz |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | BRADLEY, A. W., J. joined by Abrahamson, J. dissent (Opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the petitioners-appellants-petitioners, there was a brief by *John R. Monroe* and *John Monroe Law PC*, Rosewell, GA, and oral argument by *John Monroe*

For the respondent-respondent, the cause was argued by *John Walter Strange Jr.,* assistant city attorney, with whom on the brief was *Michael P. May*, city attorney.

For the amicus curiae, there was an amicus curiae brief by *Misha Tseytlin*, *solicitor general*, *Brad Schimel*, attorney general, and oral argument by *Ryan J. Walsh*, Lake Mills on behalf of the Wisconsin Department of Justice.

                                        NOTICE

                                This opinion is subject to further
                                editing and modification.   The final
                                version will appear in the bound
                                volume of the official reports.

No. 2015AP146
(L.C. No.  2014CV61)

STATE OF WISCONSIN             :      IN SUPREME COURT

**Wisconsin Carry, Inc. and Thomas Waltz,**

  **Petitioners-Appellants-Petitioner,**                    **FILED**

  **v.**                                                 **MAR 7, 2017**

**City of Madison,**                                        Diane M. Fremgen
                                                    Clerk of Supreme Court

  **Respondent-Respondent-Respondent.**

---

     REVIEW of a decision of the Court of Appeals.  *Reversed* and the cause remanded to the circuit court for further proceedings consistent with this opinion.

     ¶1   DANIEL KELLY, J.   The question before the court is whether the City of Madison (the "City"), through its Transit and Parking Commission (the "Commission"), may prohibit passengers from bearing weapons on the buses it operates as "Metro Transit."[1]

---

     [1] This is a review of a published decision of the court of appeals, <u>Wisconsin Carry, Inc. v. City of Madison</u>, 2015 WI App 74, 365 Wis. 2d 71, 870 N.W.2d 675, affirming the circuit court's dismissal of a complaint seeking declaratory relief against Respondent.

## I.   BACKGROUND

¶2   The Commission adopted a rule on July 12, 2005, to address the conduct of passengers using Metro Transit's public transportation services (the "Rule").[2]   The Rule identifies several types of unacceptable conduct, any one of which subjects the offending individual to potential expulsion from city buses. As relevant here, the Rule says:

> The following conduct is prohibited in all Metro facilities, including but not limited to, buses . . . .   Any individual observed engaging in the conduct may be told by a Bus Operator or Supervisor or other authorized individual to leave the facilities immediately and may be subject to arrest by proper authorities[:]
>
> . . . .
>
> - Bringing any items of a dangerous nature on-board buses including: weapons (pistols, rifles, knives or swords) . . . .[3]

---

[2] Although the Rule's terms provide the impetus for this case, neither party ever identified the operative language we are supposed to be considering. Nor does the Rule appear anywhere in the record.   Inasmuch as the City does not deny enforcing a policy against carrying weapons on city buses, we take notice of the Rule as found on the City's website (http://www.cityofmadison.com/metro/documents/ RulesofConduct.pdf) and include relevant portions as Appendix A. The same prohibition appears in the City's "Ride Guide" (relevant portions of which we reproduce as Appendix B) and we take notice of it as well.   We may take notice of this material pursuant to Wis. Stat. § 902.01(2)(b) & (3) (2013–14).

[3] Rule at 4; Appendix A at 2. The Ride Guide is similar: "For the safety and comfort of all riders: . . . No weapons allowed of any kind."  Ride Guide at 6; Appendix B at 2.

¶3 Petitioners, Wisconsin Carry, Inc. and Thomas Waltz ("Wisconsin Carry"), contacted Metro Transit[4] and asked that it amend the Rule to harmonize it with 2011 Wisconsin Act 35 ("Act 35"), which (amongst other things) authorized Wisconsin residents to carry concealed weapons upon obtaining the required license. Wisconsin Carry also asserted that Wis. Stat. § 66.0409 (2013-14)[5] deprived the City of its erstwhile authority to enforce the Rule's prohibition of weapons on the City's buses. This statute, which imposes restrictions on certain local regulations, states that:

> Except as provided in subs. (3) and (4), no political subdivision may enact or enforce an ordinance or adopt a resolution that regulates the . . . possession, bearing, [or] transportation . . . of any knife or any firearm . . . unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute.

Wis. Stat. § 66.0409(2).[6] We will refer to this statute as the "Local Regulation Statute".

¶4 Metro Transit declined Wisconsin Carry's invitation to amend the Rule. Wisconsin Carry subsequently filed a

---

[4] "Metro Transit" is a sub-unit of the City of Madison. See infra part III.B.1.b.

[5] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[6] This statute defines "political subdivision" as "a city, village, town or county." Wis. Stat. § 66.0409(1)(b).

complaint[7] seeking a declaration that the City of Madison's authority to enforce the Rule has been preempted by state law. The City moved to dismiss, arguing that the complaint failed to state a claim upon which relief could be granted. Petitioners filed an amended complaint that, as relevant here, identified Madison, Wis., Gen. Ordinances § 3.14(4)(h), as the legislation offending the Local Regulation Statute.

¶5 That ordinance created the City's Department of Transportation, as well as the Commission. It charges the Commission with the responsibility to

> develop and recommend to the Common Council policies on the various elements of transit and parking and transit and parking facilities for the purpose of providing for the safe, efficient and economical movement of persons and goods in the City of Madison and the metropolitan area consistent with the Commission's mission to support the City's distinct and quality neighborhoods where people will want to live, work, do business, learn and play by providing comfortable, safe and efficient transportation.

Madison, Wis., Gen. Ordinances § 3.14(4)(g) (2007) (the "Ordinance"). In pursuit of those ends, the Ordinance empowers the Commission to adopt certain written requirements:

> To accomplish these objectives the Transit and Parking Commission shall adopt and publish in writing

---

[7] Petitioners styled their pleading as a "petition"; except in circumstances not present here, however, our rules identify the initial pleading as a "complaint." See Wis. Stat. § 802.01(1). For the sake of uniformity across our opinions, we will refer to the petitioners' initial pleading as a "complaint."

4

standards, warrants, objectives and criteria for transit, parking and paratransit operations, services and facilities in order that such operations, services and facilities function as an integrated and coordinated part of the overall adopted transportation policy.

Id. It may also establish rules and procedures as necessary to implement its duties: "The Transit and Parking Commission shall be empowered to establish such rules and procedures as may be necessary to carry out the purpose and provisions of this ordinance." Id., § 3.14(4)(h).

¶6 After Wisconsin Carry filed its amended complaint, the City renewed its motion to dismiss, which the circuit court[8] granted. Wisconsin Carry appealed and the court of appeals, in a published opinion, affirmed. We granted Wisconsin Carry's petition for review, and now reverse.

## II.  STANDARD OF REVIEW

¶7 A motion to dismiss tests the legal sufficiency of a complaint, which a court will grant only if there are no conditions under which a plaintiff may recover. Kaloti Enters., Inc. v. Kellogg Sales Co., 2005 WI 111, ¶11, 283 Wis. 2d 555, 699 N.W.2d 205. Such a motion requires a court to accept all of the complaint's factual assertions as true, along with the reasonable inferences one may take from them. Id. Resolving a

---

[8] The Honorable Ellen K. Berz presiding.

5

motion to dismiss, therefore, involves only a question of law. John Doe 1 v. Archdiocese of Milwaukee, 2007 WI 95, ¶12, 303 Wis. 2d 34, 734 N.W.2d 827. We review questions of law de novo; we do not defer to the circuit court or the court of appeals, but we benefit from their analyses. State v. Popenhagen, 2008 WI 55, ¶32, 309 Wis. 2d 601, 749 N.W.2d 611.

### III. ANALYSIS

#### A. Constitutional Background

¶8 Wisconsin Carry claims the Rule abridges the right to possess weapons on the City's buses,[9] so we will begin our analysis with a brief rehearsal of the nature of the right at issue.[10] The United States Constitution commands that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. More recently (less than twenty years ago, in fact), the people of Wisconsin enshrined

---

[9] Wisconsin Carry, in its complaint, said it instituted this action to "determine the legality of the policies and practices of [the City] from prohibiting possession of weapons by persons riding Madison Metro buses . . . ." Wisconsin Carry also says that it "[has] an interest in [its] rights to carry firearms on Madison Metro buses," and that "[The City's] policies and practices prohibit persons from riding Madison Metro buses while armed . . . ."

[10] We address the constitutional provisions regarding the right to keep and bear arms to provide background and context for our application of the statutes and ordinances Wisconsin Carry puts at issue.

the protection of this right in our own constitution: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." Wis. Const. art. I, § 25.

¶9 This is a species of right we denominate as "fundamental," reflecting our understanding that it finds its protection, but not its source, in our constitutions.[11] The right's existence precedes, and is independent of, such documents. Bearing arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." United States v. Cruikshank, 92 U.S. 542, 553 (1875); see also District of Columbia v. Heller, 554 U.S. 570, 592 (2008) ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the

---

[11] See District of Columbia v. Heller, 554 U.S. 570, 593–94 (2008) ("By the time of the founding, the right to have arms had become fundamental for English subjects. See [J. Malcolm, To Keep and Bear Arms 122–134 (1994)]. Blackstone, whose works, we have said, 'constituted the preeminent authority on English law for the founding generation,' Alden v. Maine, 527 U.S. 706, 715 (1999), cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. See [1 William Blackstone, Commentaries on the Laws of England 136, 139–140 (1765)]."); State v. Cole, 2003 WI 112, ¶20, 264 Wis. 2d 520, 605 N.W.2d 328 (Wilcox, J.) (plurality opinion) ("We find that the state constitutional right to bear arms is fundamental.").
Notwithstanding Heller's careful demonstration that this right has been fundamental since before our Nation's founding,
(continued)

7

Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed . . . .'").

¶10  Whether the Second Amendment protects this right only when corporately exercised in the context of a militia, as opposed to a person exercising it individually, has been a source of contention.  That question, however, received an authoritative answer in Heller.  After extensive textual and historical analysis, the Supreme Court concluded that the purpose of the amendment is to "guarantee the individual right to possess and carry weapons in case of confrontation." Heller, 544 U.S. at 592 (emphasis added).  Wisconsin's protection of this right does not contain the grammatical and linguistic oddities that necessitated Heller's exhaustive treatment of the question.  It is, instead, a straightforward declaration of an individual right to keep and bear arms for any lawful purpose.

¶11  One way in which people in Wisconsin may exercise this individual right is by obtaining a license to carry concealed weapons.  The genesis of this opportunity was Act 35, now codified (in part) as Wis. Stat. § 175.60.  Upon obtaining such a license, the "licensee or . . . out-of-state licensee may

the dissent says it is something less.  But it does not say when or how it was demoted.

8

carry a concealed weapon[12] anywhere in this state except as provided under subs. (15m) and (16) and ss. 943.13(1m)(c) and 948.605(2)(b)1r." Wis. Stat. § 175.60(2g). We will refer to this statute as the "Concealed-Carry Statute".

¶12 Act 35 also eliminated the prohibition against carrying a loaded handgun in a vehicle. The statutory provision governing the interaction between weapons and vehicles now says: "Except as provided in sub. (4), no person may place, possess, or transport a firearm . . . in or on a vehicle, unless one of the following applies: 1. The firearm is unloaded or is a handgun." Wis. Stat. § 167.31(2)(b). We will refer to this statute as the "Vehicle Statute." A "firearm" is "a weapon that acts by force of gunpowder." Wis. Stat. § 167.31(1)(c). For the purpose of this statute, "vehicle" means "every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except railroad trains." Wis. Stat. §§ 167.31(1)(h), 340.01(74).

¶13 With that brief refresher, we turn now to the Rule.

B. Effect of the Local Regulation Statute

¶14 Wisconsin Carry tells us that the City's Common Council, and all of its subordinate entities, may regulate the

---

[12] A "weapon" is "a handgun, an electric weapon, as defined in s. 941.295(1c)(a), or a billy club." Wis. Stat. § 175.60(1)(j).

possession, bearing, and transportation of arms only to the extent allowed by the Local Regulation Statute.  One of the key limitations imposed by that statute, they say, is that regulations on this subject may be no more stringent than analogous state statutes.  They argue that, inasmuch as the Rule entirely forbids the possession, bearing, and transportation of arms on city buses, the City may no longer enforce it because there is no state statute so stringent.

¶15 The City responds that the Local Regulation Statute has nothing to say about the Rule.  First, it asserts that the Rule is no more stringent than state statutes.  Additionally, because it owns the buses, the City says it may keep them weapon-free just as readily as a private individual may prohibit weapons in his own vehicle.  Second, even if it _were_ more stringent than state statutes, the City says the Local Regulation Statute's plain terms express the legislature's decision to leave municipal regulations like the Rule alone.  The statute applies only to "political subdivisions," which (according to the internal definitions) comprise only cities, villages, towns and counties.  Wis. Stat. § 66.0409(1)(b).  The Commission is none of those and so, according to the City, it is

unencumbered by the statute.[13] Further, the statute's strictures apply to a political subdivision's "ordinances" and "resolutions." Wis. Stat. § 66.0409(2). The City says a "rule" is different from ordinances and resolutions, and therefore lies beyond the statute's reach.

¶16 Resolving this case will therefore require that we determine whether the Local Regulation Statute applies to the Commission and the rules it adopts, and (if so) whether the Rule is impermissibly more stringent than analogous state statutes.[14] We must also compare the Rule to the Concealed-Carry Statute to determine whether the latter preempts the former.

1.   Applicability to the Commission

¶17 We will begin with whether the Local Regulation Statute affects rules adopted by the Commission. If it does not, there is no need to determine whether the Rule is more stringent than a state statute.

---

[13] The City made this argument explicitly before the Circuit Court. Here, it is an implicit part of its argument that the Local Regulation Statute does not apply because it addresses only ordinances and resolutions (which are the legislative devices of political subdivisions).

[14] We express no opinion on the City's authority to regulate the possession of weapons on its buses prior to enactment of the Local Regulation Statute, the Concealed-Carry Statute, and the current version of the Vehicle Statute.

¶18 With its frequent reference to the "plain text" of the Local Regulation Statute, the City urges us (sotto voce, to be sure) to engage the "plain meaning" rule as we consider the statute's relationship to the Commission and its Rule. This axiom, which is the bedrock of the judiciary's methodology, says that "[i]f the plain meaning of the statute is clear, a court need not look to rules of statutory construction or other extrinsic aids. Instead, a court should simply apply the clear meaning of the statute to the facts before it." UFE Inc. v. Labor and Indus. Review Comm'n, 201 Wis. 2d 274, 281–82, 548 N.W.2d 57 (1996) (citation omitted).

¶19 We must, however, keep in mind that this axiom does not reduce the judicial function to mechanically comparing the words of a statute to the name given a legislative enactment, or the body enacting it. We are not merely arbiters of word choice. If we were, we would need do nothing more than confirm that "rule" is a word different from "ordinance" and "resolution," and that "commission" is etymologically distinct from "city," "village," "town," and "county."

¶20 It is, instead, the "plain meaning" of a statute we must apply. We find that meaning in the statute's text, context, and structure: "[S]tatutory interpretation 'begins with the language of the statute.' . . . [It] is interpreted in the context in which it is used; not in isolation but as part of a

12

whole; in relation to the language of surrounding or closely-related statutes . . . ." State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). We examine the statute's contextualized words, put them into operation, and observe the results to ensure we do not arrive at an unreasonable or absurd conclusion. Id., ¶46 ("[S]tatutory language is interpreted . . . reasonably, to avoid absurd or unreasonable results.").[15] Here, the process requires us to survey how a city's legislative authority is affected by a statute forbidding it from enacting or enforcing an ordinance or resolution on a given subject. If a city's governing body thereby loses authority to legislate on that subject, we must then consider whether a city's sub-unit can nonetheless legislate on that subject when authority is denied to the governing body itself.

a. Municipal Authority

¶21 It is true, and ever has been, that cities exercise only such authority as they receive from our constitution and

---

[15] The dissent faults us for emphasizing that the "plain meaning" doctrine focuses on the statute's meaning. We think discovering the meaning of a statute is not just a worthy endeavor, but also an exhaustive recitation of the judiciary's authority when interpreting a statute. We find the statute's meaning in its words, context, and interaction with closely-related statutes, just as Kalal describes.

13

statutes. "[C]ities are creatures of the state legislature that have no inherent right of self-government beyond the powers expressly granted to them." Black v. City of Milwaukee, 2016 WI 47, ¶23, 369 Wis. 2d 272, 882 N.W.2d 333 *(quoting Madison Teachers, Inc. v. Walker,* 2014 WI 99, ¶89, 358 Wis. 2d 1, 851 N.W.2d 337 (citing *Van Gilder v. City of Madison,* 222 Wis. 58, 72-73, 267 N.W. 25 (1936) (citing *City of Trenton v. New Jersey,* 262 U.S. 182, 187 (1923)))) *(internal quotation marks omitted). And if a statute may confer authority on a city, a statute may take it away.* City of Trenton, 262 U.S. at 187 ("A municipality is merely a department of the state, and the state may withhold, grant, or withdraw power and privileges as it sees fit.").

¶22 One necessary corollary to this principle is that a city may not create authority ex nihilo, either for itself or its divisions. Were it otherwise, the ability of a constitution and legislature to control a city's quantum of authority would come to naught——upon the loss of some measure of authority, an enterprising city could simply declare it reinstated. But this is not part of a city's remit, and so there is no mechanism by which it may regain withdrawn authority but by legislative decree or constitutional amendment.

¶23 In light of these principles, we must determine what the Local Regulation Statute means when it says "no political subdivision may enact or enforce an ordinance or adopt a

14

resolution that regulates the . . . possession, bearing, [or] transportation . . . of any knife or any firearm . . . ." Wis. Stat. § 66.0409(2). The City acknowledges that this provision eliminates the common council's authority to enact or enforce an ordinance or resolution on the identified subject (unless it falls within the saving clause). Therefore, the question (at this stage of the analysis) is whether ordinances and resolutions comprise a municipal governing body's complete legislative authority. If they do, then losing the ability to adopt an ordinance or resolution on a particular subject represents the complete withdrawal of authority to legislate on that subject. And if the City has no legislative authority with respect to that subject, it necessarily has nothing to delegate to its divisions.[16]

¶24 With respect to the nature of ordinances and resolutions, the City directs our attention to Cross v. Soderbeck, 94 Wis. 2d 331, 288 N.W.2d 779 (1980). There, we said:

---

[16] This proposition follows by necessary implication from the fact that municipalities have no authority but what they are given. Willow Creek Ranch, LLC v. Town of Shelby, 2000 WI 56, ¶17, 235 Wis. 2d 409, 611 N.W.2d 693 (citing First Wis. Nat'l Bank of Milwaukee v. Town of Catawba, 183 Wis. 220, 224, 197 N.W. 1013 (1924) ("Municipal bodies have only such powers as are expressly conferred upon them by the legislature or are necessarily implied from the powers conferred.")).

> A municipal ordinance or by-law is a regulation of a general, permanent nature, enacted by the governing council of a municipal corporation. . . . A resolution, or order as it is sometimes called, is an informal enactment of a temporary nature, providing for the disposition of a particular piece of administrative business of a municipal corporation. . . . And it has been held that even where the statute or municipal charter requires the municipality to act by ordinance, if a resolution is passed in the manner and with the statutory formality required in the enactment of an ordinance, it will be binding and effective as an ordinance.

Id. at 342 (citing Wis. Gas & Elec. Co. v. City of Ft. Atkinson, 193 Wis. 232, 243-44, 213 N.W. 873 (quoting 19 Ruling Case Law 895, § 194 (1917)) (internal quotation marks omitted)).

¶25 From this we may derive three principles useful to our inquiry. First, ordinances are municipal legislative devices, formally enacted, that address general subjects in a permanent fashion. Second, resolutions are those informal municipal legislative acts that address particular pieces of administrative business in a temporary fashion. And third, the label given to a legislative device is not dispositive——one identifies the device's taxonomy functionally.

¶26 The scope of legislative activity covered by ordinances and resolutions, therefore, extends to formal and informal enactments that address matters both general and specific, in a manner meant to be either temporary or permanent, and which can be characterized as administrative or otherwise. And we will treat a municipality's legislative device as an

16

ordinance or resolution, regardless of how it may be denominated, so long as it functions within the scope of this definition.[17]

¶27 It is apparent from this that there is no legislative action a municipality could take, either in form or function, that would not come within the ambit of "ordinance" or "resolution." Consequently, if a statute removes the authority of a municipality's governing body to adopt an ordinance or resolution on a particular subject, the governing body loses all legislative authority on that subject.

---

[17] This generality comports well with the dictionary definition of "ordinance": "An authoritative law or decree; specif., a municipal regulation, esp. one that forbids or restricts an activity." Ordinance, Black's Law Dictionary (10th ed. 2014). It also compares favorably with Doe v. Medford Sch. Dist. 549C, 221 P.3d 787 (Or. App. 2009), a case the City cited in its discussion about the nature of ordinances. There, the court said:

> The term "ordinance," as it is used in ordinary communications, has both a narrow and a broader meaning. [In its narrow meaning] [i]t can refer to "a public enactment, rule, or law promulgated by governmental authority: as . . . a local law or regulation enacted by a city council or other similar body under powers delegated to it by the state." . . . The word "ordinance" also has a broader common meaning, however. At least in some contexts, the term may not be limited to enactments of law but, more generally to an "established rule, policy, or practice."

> Id. at 793 (quoting Webster's Third New Int'l Dictionary 1588 (unabridged ed. 1993)).

¶28 Thus, the plain meaning of the Local Regulation Statute is that the legislature withdrew from the City's governing body all authority to legislate on the subjects it identifies, including the "possession, bearing, [or] transportation . . . of any knife or any firearm" unless the legislation is "the same as or similar to, and no more stringent than, a state statute."   Wis. Stat. § 66.0409(2).   Because a municipality cannot delegate what it does not have, the City is entirely powerless to authorize any of its sub-units to legislate on this subject.[18]

¶29 The City notes, and properly so, that it has no ordinance addressing, in explicit terms, the possession, bearing, or transportation of knives or firearms.   In the absence of such an ordinance, the City says there is nothing on which the Local Regulation Statute may operate.

¶30 But the City itself necessarily identifies the Ordinance as the legislation that authorizes the regulation of firearms.   This is so because the City must appeal to it for the Rule's efficacy.   Unless the Commission has some source of authority independent of the City, its authority to adopt the Rule must flow from the City to the Commission through the Ordinance.   By claiming the Rule is authoritative, the City is

---

[18] See supra n.16.

18

itself telling us that the Ordinance contains a firearms-regulating grant of authority. And that is how the Ordinance comes within the Local Regulation Statute's purview.

¶31 Put another way, the City may not simultaneously maintain that the Commission has the authority to regulate firearms while denying that any of its ordinances authorize the regulation of firearms. Cities may, and often do, delegate authority to their sub-units without explicitly describing each and every subject the sub-unit may address. The broader the grant of authority, the more general the language. That is true here——the Ordinance is a very generalized grant of authority to the Commission to address mass transit issues.

¶32 But the generalization does not mean the grant of authority to regulate firearms is not there; it just means it is not explicit. It is the Ordinance's implicit grant of firearm-regulating authority on which the Local Regulation Statute performs its work. And that work consists of restricting the Ordinance's grant of firearm-regulating authority. So, if the Commission has the authority to regulate firearms more stringently than state statutes, it must find the source of that authority somewhere other than the City.

b. Potential Alternative Sources of Commission Authority

¶33 To discover the full scope of the Commission's authority, we must determine what manner of entity it is, and

whether it draws regulatory authority from some source other than the City.  The City's ordinances say a "commission" is "a Sub-unit of the City."   Madison, Wis., Gen. Ordinances § 33.01(3)(c).  The City creates "standing" sub-units (which are those meant to exist permanently) by ordinance.  See id. § 33.01(3)(e) & (4)(b).  The Ordinance makes the Commission a standing sub-unit.

¶34  The Ordinance provides that the Commission is a public utility within the meaning of Wis. Stat. § 66.0805.  This statute grants municipalities the authority to create commissions to govern public utilities, but it contains no independent grant of authority to such commissions.[19]  As a public utility, the Commission exercises its authority under the supervision of the City: "The board of commissioners, under the general control and supervision of the governing body, shall be responsible for the entire management of and shall supervise the operation of the utility."  Wis. Stat. § 66.0805(1).  The City exercises its supervisory authority via ordinance: "The governing body shall exercise general control and supervision of the commission by enacting ordinances governing the commission's operation."  Id.

---

[19] "[T]he governing body of a city shall . . . provide for the nonpartisan management of a municipal public utility by

(continued)

20

¶35 The Ordinance says the Commission is also a transit commission within the meaning of Wis. Stat. § 66.1021. This section grants municipalities the authority to create transportation systems as well as commissions to govern them: "A city . . . may enact an ordinance for the establishment, maintenance and operation of a comprehensive unified local transportation system . . . . 'Transit commission' or 'commission' means the local transit commission created under this section." Wis. Stat. § 66.1021(1), (3)(b). The statute does not directly grant the Commission any authority, but it does identify some of the authority the Commission must be furnished by the municipality's enacting ordinance,[20] none of which is at issue here.

¶36 The Ordinance contains its own description of the authority the Commission is to exercise. So, for example, it has the authority to recommend transit-related policies to the common council for its consideration: "The Transit and Parking Commission shall make recommendations to the Common Council regarding policies on all transit and parking matters . . . ." Madison, Wis., Gen. Ordinances § 3.14(4)(a); see also id.

---

creating a commission under this section." Wis. Stat. § 66.0805(1).

[20] For example, the statute says a transit commission may appoint certain employees, conduct hearings, hold regular meetings, adopt a seal, etc. Wis. Stat. § 66.1021(6) & (7).

§ 3.14(4)(g) ("It shall be the general duty of the Transit and Parking Commission to develop, and recommend to the Common Council policies on the various elements of transit and parking and transit and parking facilities for the purpose of providing for the safe, efficient and economical movement of persons and goods in the City of Madison and the metropolitan area . . . .").

¶37 Finally, the Commission may adopt "standards, warrants, objectives and criteria for transit, parking and paratransit operations" pursuant to its authority under the Ordinance. Id. It may also establish rules and procedures as necessary to implement its duties. Id. § 3.14(4)(h). With respect to transit, the Commission's duty is to "provide overall management, operation and control of the assets of the City of Madison transit and paratransit transportation system to ensure that it functions as an integrated part of the overall transportation system." Id. § 3.14(4)(h)2.

¶38 The City has not identified, and we have not found, any authority for the Commission's existence apart from what we just described. It is apparent from these provisions that the Commission is entirely a creature of the City and exercises only that amount and type of authority it receives from the City. The Ordinance, by its express terms, created the Commission and

22

infused it with enumerated responsibilities.[21] Although the statutes relating to public utilities and transit commissions describe certain attributes the governing commissions must have, they do not, by their own force, call the Commission into existence or endow it with authority independent of what they confer on the City. Instead, they simply grant municipalities the authority to create the commissions in the manner and with the attributes the statutes prescribe.

¶39 The Commission has no authority but for what it received from the City, and the City has no authority to legislate contrary to the boundaries established by the Local Regulation Statute. This means that if the Rule is more stringent than a state statute, then to that extent the City no longer has authority to enforce it.

c. Purpose of the Local Regulation Statute

¶40 Before we measure the Rule's stringency, we pause to address the City's argument that this result would frustrate the

---

[21] Madison, Wis., Gen. Ordinances § 3.14(4)(a) ("There is hereby created a Transit and Parking Commission charged with the duties and responsibilities contained herein.").

statute's purpose.[22]   The City speculates that the legislature wished to limit a city's authority to regulate firearms, but only when the city's governing body acts qua governing body.   It says the statute's plain reference to only ordinances and resolutions demonstrates that the legislature intended to leave intact a municipal sub-unit's authority to regulate firearms.[23]

---

[22] We may consider the statute's purpose while conducting a "plain meaning" analysis, so long as we refer only to the statute's text and structure.   State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶48, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]cope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself, rather than extrinsic sources, such as legislative history.").

[23] The dissent wishes we had consulted legislative history on this question, and suggests we did not do so because it would contradict our interpretation of the Local Regulation Statute. We did not address legislative history for two reasons.   First, we had no difficulty finding the statute's meaning without it (as Kalal contemplates).   And second, the history the dissent identified has no instructive merit.   The two failed municipal gun-control referenda mentioned in State v. Cole, 264 Wis. 2d 520,  ¶¶62-63 (Prosser, J., concurring), and the statements of one assemblyman, might be able to tell us what motivated the legislature to enact the Local Regulation Statute. But motivation and meaning are not necessarily the same thing. Even if every legislator publicly announced the intent behind the way he or she voted, that knowledge would give us no aid in understanding the Local Regulation Statute.   We find the legislature's intent in the words it adopts, not the expressed (or unexpressed) subjective reasons the 132 legislators had for adopting those words.   Kalal, 271 Wis. 2d 633, ¶52.   Cherry-picking the statements of one such legislator, as the dissent does, just gives us 1/132 of a body of information that tells us nothing about the meaning of the statute.

¶41 In the City's reading of the statute, the legislature made a conscious decision to withdraw firearms-regulating authority from a municipality's democratically-accountable governing body, while leaving that authority entirely undiminished when exercised by the municipality's democratically-unaccountable sub-units.[24] The only explanation offered for why the legislature would trust firearms-regulating authority to a municipal sub-unit, but not the governing body to which it owes its existence and power, is that the latter's legislative authority is broader than that of the former. The implication is that municipalities are eager to impose aggressive firearms regulations, and that impulse must be curbed by ensuring that any such regulations could be adopted only piecemeal, within the limited portfolio of each democratically-unaccountable sub-unit.

¶42 But if the City's speculation is correct, if the legislature really did adopt the Local Regulation Statute to restrict the scope of any given municipal firearms regulation,

---

[24] The Commission's members are appointed, not elected: "The Transit and Parking Commission shall consist of nine (9) voting members to serve without compensation consisting of three (3) members of the Common Council, six (6) citizens and two (2) alternates . . . at least one (1) of whom shall be a citizen." Madison, Wis., Gen. Ordinances § 3.14(4)(b). "Citizen members of the Transit and Parking Commission shall be appointed by the Mayor subject to confirmation by the Common Council." Id. § 3.14(4)(d).

25

it chose a singularly ineffective means of doing so. It does not require mastery of three-dimensional chess, nor even checkers, to devise a strategy for defeating such an objective.

¶43 Deprived of native authority to regulate firearms, a city might simply create a "public-safety commission" with a mandate to secure the public's well-being in all publicly-accessible spaces. The enabling ordinance would make no specific reference to firearms, so (under the City's theory) it would escape the Local Regulation Statute's attention. The public-safety commission would then adopt the same city-wide firearms regulation the city's governing body could not itself adopt. The scope of the resulting regulation would not have suffered the least restriction by virtue of the Local Regulation Statute. Alternatively, a municipality bent on adopting comprehensive firearms regulations could simply create a number of limited-portfolio sub-units whose cumulative scope of authority would equal that of the municipality. The sub-units could then adopt firearms regulations that would differ in no meaningful way from a single regulation adopted by the municipality's governing body. Functionally, this imputed purpose would leave the statute with neither meaning nor effect.

¶44 In light of these obvious workarounds, we are unwilling to join the City's speculation that the legislature chose to entrust firearms-regulating authority to municipal sub-

26

units, but not their democratically-accountable progenitors.[25] If the legislature actually intended such an easily thwarted purpose, it gave us no textual clues by which to discern it.

¶45 Finally, the City asserts that if the legislature had intended to include "rules" in the realm of prohibited legislative acts, it would have said so. It observes that other states, when they restricted local firearms regulations, listed other types of legislative devices in their prohibitions. For instance, it notes that Idaho's statute applies to "any law, rule, regulation, or ordinance." Idaho Code Ann. § 18-3302J (2016).[26] And Florida's statute refers not just to ordinances, but also administrative regulations and rules. Fla. Stat. Ann.

---

[25] The City argued that this conclusion would "deprive the people of Wisconsin [of] the right to democratically decide if public buses are an appropriate place for loaded handguns." Actually, it protects that very thing. The people of Wisconsin, through their duly-elected legislators, have had their say on this issue. Allowing an unelected body like the Commission to overrule the people's decision would not protect their democratically-expressed will, it would thwart it.

[26] The relevant portion of the Idaho statute says:

(2) Except as expressly authorized by state statute, no county, city, agency, board or any other political subdivision of this state may adopt or enforce any law, rule, regulation, or ordinance which regulates in any manner the sale, acquisition, transfer, ownership, possession, transportation, carrying or storage of firearms or any element relating to firearms and components thereof, including ammunition.

Idaho Code Ann. § 18-3302J(2) (2016).

27

§ 790.33 (West 2007 & Supp. 2016).[27] And Kansas's statute covers "administrative actions." Kan. Stat. Ann. § 12-16,124 (Supp. 2015).[28] And so on. But if the label of a legislative act is dispositive, then Idaho's local communities are vulnerable to local "policies" regulating firearms, Florida would presumably allow "resolutions" restricting firearms, and Kansas (apparently) is willing to countenance local regulations in the form of an "ordinance." Here in Wisconsin, the legislature

---

[27] The relevant portion of the Florida Statute says:

> (1) Preemption.--Except as expressly provided by the State Constitution or general law, the Legislature hereby declares that it is occupying the whole field of regulation of firearms and ammunition, including the purchase, sale, transfer, taxation, manufacture, ownership, possession, storage, and transportation thereof, to the exclusion of all existing and future county, city, town, or municipal ordinances or any administrative regulations or rules adopted by local or state government relating thereto. Any such existing ordinances, rules, or regulations are hereby declared null and void.

Fla. Stat. Ann. § 790.33(1) (West 2007 & Supp. 2016).

[28] The relevant portion of the Kansas statute says:

> (a) No city or county shall adopt or enforce any ordinance, resolution or regulation, and no agent of any city or county shall take any administrative action, governing the requirement of fees, licenses or permits for, the commerce in or the sale, purchase, transfer, ownership, storage, carrying, transporting or taxation of firearms or ammunition, or any component or combination thereof.

Kan. Stat. Ann. § 12-16,124(a) (Supp. 2015).

would need to be even more cognizant of the labels a municipality might attach to its legislation: The Ordinance, for example, authorizes the Commission to adopt, amongst other things, rules, procedures, standards, warrants, and objectives.

¶46 Accepting the City's argument would require the legislature to list every possible label for a legislative act before we could conclude that its intention was to withdraw from a municipality the authority to regulate a particular subject. And it would further require that the legislature amend the statute every time a municipality conceived of a new label for its legislative acts. But this is law-making as comedy, with a hapless legislature chasing about a wily municipality as it first enacts an ordinance on a forbidden subject, and then a policy, then a rule, then a standard, and on and on until one of them wearies of the pursuit or the other exhausts the thesaurus.[29] The City advocated its interests in a competent and

---

[29] As an alternative to listing a multitude of labels for prohibited legislation, some states instead use a catch-all phrase to describe the method by which the legislative act is adopted. Arkansas, for example, states that local governments "shall not enact any ordinance or regulation pertaining to, or regulate in any other manner" the identified subjects. Ark. Code. Ann. § 14-16-504(b)(1)(A) (2013) (emphasis added). Kansas, on the other hand, forbids local "administrative action" related to firearms. Kan. Stat. Ann. § 12-16,124 (Supp. 2015). But this does not end the lexical chase, it just shifts it to the label given to the municipal action that produces the legislation.

professional manner, so we are confident it does not really intend that we understand the legislative process in this fashion.[30] Thus, in the absence of any discernible reason to do so, we will not.[31]

## 2. Stringency

¶47 Because we conclude that the City——acting either through its governing body or sub-units——has no authority to "regulate[] the . . . possession, bearing, [or] transportation . . . of any knife or any firearm . . . unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute,"[32] we must now determine whether the Rule

---

[30] Under the guise of "judicial restraint," however, this is how the dissent would have us understand the Local Regulation Statute. Its two-sentence statutory analysis comprises, in its entirety, this: "The bus rule is neither an 'ordinance' nor a 'resolution,' and it was not enacted by the city. That should be the end of the analysis." Dissent at ¶73. But "judicial restraint" does not mean superficial or incomplete. The dissent is curiously incurious about whether municipalities have legislative authority outside of "ordinances" and "resolutions." Instead, without analysis, it simply assumes they do, and further assumes the Commission's authority to adopt the Rule flows from that phantom authority. While that analysis is certainly original, it has nothing to do with judicial restraint.

[31] Kalal, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted . . . reasonably, to avoid absurd or unreasonable results.").

[32] Wis. Stat. § 66.0409(2).

satisfies the stringency standard.[33]   It is the City's prerogative to choose the legislation against which we will compare the Rule (at least initially), and it has chosen the Vehicle Statute.

¶48 The Vehicle Statute governs the safe use and transportation of firearms.  The specific portion of the statute the City recommends for our consideration prohibits the placing, possession, or transportation of a firearm in a vehicle unless it is unloaded or a handgun.  Wis. Stat. § 167.31(2)(b)1.  That is to say, the Vehicle Statute allows a person to carry a loaded handgun, or an unloaded firearm of a different type, in a vehicle.  A vehicle (for purposes of this statute) includes "every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except railroad trains," as well as snowmobiles, all-terrain vehicles and electric personal assistive mobility devices.  Id. §§ 167.31(1)(h), 340.01(74).  We trust it is beyond cavil that a bus is a vehicle within the scope of this definition.

---

[33] The Local Regulation Statute authorizes local legislation so long as it is both the "same as or similar to" and "no more stringent than" a state statute.  Because the stringency analysis resolves this matter, we need not inquire into whether the Rule or Ordinance is the same as or similar to a state statute.

¶49 So in choosing the Vehicle Statute for comparison, the City asserts that a total ban on carrying any firearm on a bus is no more stringent than a statute that bans only loaded non-handguns on a bus. These provisions occupy almost perfect legislative antipodes. Unless the City has a method by which it can explain how the distance between the two is more apparent than real, we must conclude the Rule is impermissibly more stringent than the Vehicle Statute.

¶50 The City says it can harmonize the Vehicle Statute and the Rule by observing that the former allows an individual to carry a firearm only in "a" vehicle, not "any" vehicle or "all" vehicles. The City does not explain what difference it would make if the legislature had chosen "any" or "all" instead of "a." Instead, it skips almost immediately to the conclusion that the legislature's word choice created maneuvering room for restrictive municipal firearms regulations. There is no readily-apparent principle that would link the City's

32

proposition to its conclusion, and we will not further explore this argument when the City has chosen to remain silent.[34]

¶51 The City also says it can harmonize the two provisions because the Vehicle Statute does not say a person must carry a firearm on a bus. It is true the Vehicle Statute is prohibitory (as the City pointed out), and it is also true that an exception from a prohibition is not the same thing as a mandate. This means that although the Vehicle Statute does not prohibit a person from carrying a firearm in a vehicle (except as described above), it also does not require a person to carry such a weapon in a vehicle. But this can give the City no succor. The City bans the carrying of all firearms on its buses. So its burden is not to find a statute that neither bans nor requires carrying firearms, its burden is to identify a statute that does ban, and does so at least as restrictively as the Rule. As relevant here, the Vehicle Statute prohibits only the carrying of loaded non-handguns in a vehicle. Consequently, the Vehicle Statute justifies the Rule only in that regard. By also banning the

---

[34] As an entirely practical matter, an individual can carry a weapon in only one vehicle at a time, so there is no need to use "any" or "all" in the statute. "Any" bus in the City's fleet becomes "a" bus within the meaning of this statute the instant an individual boards it with a permissible firearm. The same is true of "all" city buses. So there is no point in distinguishing between "a" bus, on the one hand, and on the other "any" or "all" buses.

carrying of knives, handguns (whether loaded or not), and unloaded non-handguns, the Rule is dramatically more restrictive than the Vehicle Statute.

¶52 The City also says the Rule is no more restrictive than Wisconsin's Statutes because, as owner of its buses, it has the same authority to ban the carrying of weapons as individuals have in banning weapons from their private vehicles. There are two reasons this cannot justify the Rule. The first, and most obvious, is that an individual's right to ban weapons from his vehicle is not statutory, and so cannot serve as the point of comparison. He may keep weapons from his vehicle because he has the right to exclude others from his property. He needs no statutory grant, and he has received none; his authority is incident to his property right in the vehicle. He can keep weapons out of his car because he can deny a person entry for any reason he may choose.[35] So if he does not want weapons in

---

[35] "Property rights in a physical thing have been described as the rights to possess, use and dispose of it . . . . The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citation and internal quotation marks omitted); Rakas v. Illinois, 439 U.S. 128, 143 (1978) ("One of the main rights attaching to property is the right to exclude others . . . ." (citing W. Blackstone, Commentaries, Book 2, ch. 1")); Jacque v. Steenberg Homes, Inc., 209 Wis. 2d 605, 618, 563 N.W.2d 154 (1997) ("[T]he private landowner's right to exclude others from his or her land is 'one of the most essential sticks in the
(continued)

34

his vehicle, he may simply deny the person carriage unless he first divests himself of his weapons. Thus, there is no sense in which the Rule can be described as "the same as or similar to, and no more stringent than, a state statute."[36]

¶53 Second, the City's ownership rights in its buses are not the same as an individual's ownership rights in his private vehicle. It is possible the City means its argument to assert that the Local Regulation Statute's reference to "a state statute" as the point of comparison is meant to be longhand for "law," thereby giving us leave to compare the Rule's stringency against non-statutory sources of law. If that is what the reference means——and we do not believe it is——the City would still be unable to justify the Rule. The City's argument is dependent on demonstrating that its authority to exclude passengers from its buses is coextensive with an individual's authority to deny carriage to another. For the following reasons, it is not.

¶54 Governments, whether great or small, exercise only that amount of authority they rightfully receive from those they

---

bundle of rights that are commonly characterized as property.'" (quoting Dolan v. City of Tigard, 512 U.S. 374, 384 (1994))).

[36] Wis. Stat. § 66.0409(2) (emphasis added).

represent.[37]   And they must use that authority only in ways that are appropriate to achieve the ends for which they were granted the authority.[38]

¶55  With respect to property entrusted to its care, the City notes that "[t]he State, no less than a private owner of

[37] "[T]he people of the several States are the only true source of power . . . .   All powers that the Constitution neither delegates to the Federal Government nor prohibits to the States are controlled by the people of each State." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 847-48 (1995); see also W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 641 (1943) ("There is no mysticism in the American concept of the State or of the nature or origin of its authority.   We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority."); Halter v. Nebraska, 205 U.S. 34, 43 (1907) ("It is not extravagant to say that to all lovers of the country [the American flag] signifies government resting on the consent of the governed . . . ."); Texas v. White, 74 U.S. (7 Wall.) 700 (1868) ("A State, in the ordinary sense of the Constitution, is a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed."); Goodall v. City of Milwaukee, 5 Wis. 32, 38 (1856) ("In England, the Parliament is said to be supreme, omnipotent, and to its mandates the highest, as well as the lowest, in all their rights and acquisitions must yield. Not so here; all departments of government derive their powers from the prescribed consent of the people who are governed".

[38] "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421, (1819). Johnston v. City of Sheboygan, 30 Wis. 2d 179, 186, 140 N.W.2d 247 (1966) (quoting M'Culloch).

property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Adderley v. Florida, 385 U.S. 39, 47 (1966). The City lawfully dedicated its buses to providing "safe, efficient and economical movement of persons and goods in the City of Madison and the metropolitan area consistent with the Commission's mission to support the City's distinct and quality neighborhoods where people will want to live, work, do business, learn and play by providing safe and efficient transportation." Madison, Wis., Gen. Ordinances § 3.14(4)(g). Thus, the City says, Adderley gives it authority to exercise over its buses the rights typical of private ownership in pursuit of those enumerated purposes. So we must determine whether Adderley allows the City to pursue these purposes by banning weapons on the same basis that a private individual bans weapons from his private vehicle. We conclude it does not.

¶56 An individual may ban weapons because he has unlimited discretion to bar anyone and everyone from his vehicle for any reason, or even no reason at all. The City enjoys no such latitude with respect to bus passengers. Indeed, the City's ability to exclude passengers is subject to significant circumscription. The most significant is that, whatever property rights it might have, it may not use them in derogation of the law: "[A] municipality cannot lawfully forbid what the

37

legislature has expressly licensed, authorized or required, or authorize what the legislature has expressly forbidden." Fox v. City of Racine, 225 Wis. 542, 545, 275 N.W. 513 (1937).

¶57 Adderley is entirely incapable of pushing that principle aside. Adderley is a First Amendment case (as are the other cases the City cited in support of its "ownership" argument), in which the Court analogized public ownership of property to private ownership as an aid in determining whether the property in question constituted a public forum for speech purposes.  This case, of course, has nothing to do with the First Amendment.   Thus, the City's argument on this point consists entirely of an analogy to free speech cases, the foremost of which (Adderley) tangentially employed an analogy between public and private ownership as part of a much broader constitutional analysis.[39]   Analogies are sometimes helpful in contextualizing an issue, but an analogy on top of an analogy rarely conveys useful information.  Such is the case here.

---

[39] The other First Amendment cases the City cited rely, at least in part, on Adderley.  See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129 (1981) (citing Adderley in the process of analyzing First Amendment challenge to Postal Service's right to restrict access to mailboxes); Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974) (citing Adderley in the process of analyzing First Amendment challenge to City's right to deny advertising request on public buses).

¶58 _Adderley_ can teach us nothing about the question at hand because the City's recursive analogies left no room for the Local Regulation Statute.  To conclude that the City's property rights allow it to exclude law-abiding members of the public from its buses, we would first have to conclude that those property rights enjoy a permanence so profound that they are immune from statutory alteration.  Those analogized rights, however, are not untouchable.  The scope and nature of property rights are defined by our laws.[40]  If the law modifies a property right, therefore, one may not assert the previous version of the property right to trump the very law that changed the right.  The Local Regulation Statute (as discussed above) forbids the City from forbidding weapons on its buses when otherwise carried in conformance with the law.  Thus, to the extent the City previously had a property-based right to exclude riders in possession of weapons, that right ceased with the advent of the Local Regulation Statute.  To claim a property right to exclude

---

[40] "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law——rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  _Bd. of Regents v. Roth_, 408 U.S. 564, 577 (1972); _see also_, _Penterman v. Wis. Elec. Power Co._, 211 Wis. 2d 458, 480, 565 N.W.2d 521 (1997) (quoting _Roth_'s proposition, _supra_, that property interests are created and defined by independent sources such as state law).

weapons-carrying passengers from its buses is to invoke a right that no longer exists (if it ever did).

¶59 From all of this we may deduce that the City's ownership interest in its buses does not allow it to arbitrarily exclude potential passengers a la private vehicle owners. Instead, any decision to exclude must be tied to a lawful basis. With respect to a prospective passenger who is complying with the Vehicle Statute, state law offers no such basis. And the Local Regulation Statute says the City (and its sub-units) may not create such a basis. Because the City cannot exclude passengers from its buses without a lawful basis, and none exists with respect to passengers who comply with state weapons laws, the City's ownership interest in its buses gives it no authority to promulgate or enforce the Rule.

### 3. The Concealed-Carry Statute

¶60 Thus far we have considered only the Local Regulation Statute's impact on the Rule's proscription of "knives" and "firearms" on the City's buses. We addressed only those weapons in that analysis because those are the types of weapons included in the statute's mandate. But there are other types of weapons, and other statutes that speak to their regulation. Amongst these is the Concealed-Carry Statute, which covers not just

handguns but electric weapons and billy clubs as well.[41] So we now determine whether the Rule may lawfully prohibit the carrying of these types of concealed weapons.[42]

¶61 In relevant part, the Concealed-Carry Statute says a "licensee or an out-of-state licensee may carry a concealed weapon anywhere in this state except as provided under subs. (15m) and (16) and ss. 943.13(1m)(c) and 948.605(2)(b)1r." Wis. Stat. § 175.60(2g)(a). The exceptions need not detain us, because none address buses. So, because we have already concluded that the City cannot regulate firearms more stringently than state statutes, all we must do here is decide whether city buses are mobile negations of "anywhere in this state."

¶62 The City's argument did not engage the language of the Concealed-Carry Statute other than to assert that the word "anywhere" cannot really mean anywhere. There are, of course, two limitations on this right to carry concealed weapons in Wisconsin. We find the first in the statute itself, which contains a list of situations and places to which the statute's

---

[41] "'Weapon' means a handgun, an electric weapon, as defined in s. 941.295(1c)(a), or a billy club." Wis. Stat. § 175.60(1)(j).

[42] The City's authority to ban handguns has been withdrawn by the Local Regulation Statute, as described above.

mandate does not apply.[43]  The second lies in the principle that the legislature is aware of the state's existing laws, and that

---

[43] The exceptions cover only the following:
- Certain restrictions imposed by employers on their employees (Wis. Stat. § 175.60(15m);
- Certain types of buildings, consisting of (Wis. Stat. § 175.60(16)):

  1.   Any portion of a building that is a police station, sheriff's office, state patrol station, or the office of a division of criminal investigation special agent of the department;

  2.   Any portion of a building that is a prison, jail, house of correction, or secured correctional facility;

  3.   The facility established under § 46.055 [secure mental health facility for sexually violent persons];

  4.   The center established under § 46.056 [the Wisconsin Resource Center located on the grounds of the Winnebago Mental Health Institute];

  5.   Any secured unit or secured portion of a mental health institute under § 51.05, including a facility designated as the Maximum Security Facility at Mendota Mental Health Institute;

  6.   Any portion of a building that is a county, state, or federal courthouse;

  7.   Any portion of a building that is a municipal courtroom if court is in session;

  8.   A place beyond a security checkpoint in an airport;

- Restrictions imposed by authorized persons on lands, residences, commercial buildings, special event locations, buildings that are owned, occupied, or controlled by state or local governmental units, and university or college grounds or buildings (Wis. Stat. § 943.13(1m)(c)); and

- School grounds (Wis. Stat. § 948.605(2)(b)1r).

it adopts new legislation against that backdrop, leaving the present law undisturbed except so far as necessary to make room for the new.[44] As significant here, the Concealed-Carry Statute contains no text suggesting that "anywhere" includes a place the licensee has no permission or right to be. That is to say, a concealed-carry license is not a writ authorizing the licensee to force his way into a place he may not lawfully occupy. Thus, when the Concealed-Carry Statute speaks of "anywhere," it refers to anywhere the licensee may lawfully be, exclusive only of the exceptions contained in the statute itself.

¶63 Whether the Rule's prohibition of concealed weapons survives enactment of the Concealed-Carry Statute depends on whether the latter has preempted the former. We begin our analysis by recognizing that cities enjoy both constitutional and statutory grants of authority. The Wisconsin Constitution provides that "[c]ities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the

---

[44] Town of Madison v. City of Madison, 269 Wis. 609, 614, 70 N.W.2d 249 (1955) ("All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it, . . . they are therefore to be construed in connection with and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, that is, they are to be construed with a reference to the whole system of law of which they form a part.").

43

legislature of statewide concern as with uniformity shall affect every city or every village." Wis. Const. art. XI, § 3. Our legislature describes a city's authority broadly:

> Except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants, and shall be limited only by express language.

Wis. Stat. § 62.11(5).

¶64 Consequently, just because a municipal legislative act treats a subject also addressed by the legislature does not mean the former has been preempted: "[M]unicipalities may enact ordinances in the same field and on the same subject covered by state legislation where such ordinances do not conflict with . . . the state legislation." City of Milwaukee v. Childs Co., 195 Wis. 148, 151, 217 N.W. 703 (1928). We have developed a disjunctive list of considerations that assists us in determining whether a local legislative act must defer to state legislation:

> The tests for determining whether such a legislatively intended withdrawal of power which would necessarily nullify the local ordinance has occurred are:

44

> (1) whether the legislature has expressly withdrawn the power of municipalities to act;
>
> (2) whether the ordinance logically conflicts with the state legislation;
>
> (3) whether the ordinance defeats the purpose of the state legislation; or
>
> (4) whether the ordinance goes against the spirit of the state legislation.

Anchor Sav. & Loan Ass'n v. Equal Opportunities Comm'n, 120 Wis. 2d 391, 397, 355 N.W.2d 234 (1984). The Concealed-Carry Statute does not mention local regulation at all, so it does not represent an express withdrawal of a municipality's power to regulate concealed weapons within the meaning of the first Anchor test. The parties have not expounded on the "spirit" of the Concealed-Carry Statute, so there is insufficient information available to us to make the fourth Anchor test instructive. We will, therefore, concentrate on the second and third tests.

¶65 The second test inquires into whether the Rule (as an expression of the legislative authority contained in the Ordinance) logically conflicts with the Concealed-Carry Statute. That statute creates a singularly expansive right to carry concealed weapons. It extends to "anywhere in this state" except as described above. It is difficult to imagine a more comprehensive description of where the right may be exercised

45

than "anywhere." But the legislature did not have to create the right in this manner. If its paramount concern was not comprehensiveness, it could have instead provided a list of places in which the right to carry a concealed weapon could be exercised. This would almost necessarily have led to a patchwork "carry" landscape in which one would need a constantly-updated, GPS-enabled smartphone app to determine from instant to instant whether one was complying with the Concealed-Carry Statute.

¶66 The logic inherent in the legislature's decision to define the right as all-encompassing, subject only to carefully delimited exceptions, is that the right is meant to extend as far as is not inconsistent with its internally-defined limitations. There is no room in the Concealed-Carry Statute for a municipality to define "anywhere" as something other than the comprehensive expanse it was meant to be. If there were such room, Wisconsin's municipalities could instantly create the patchwork landscape the text of the Concealed-Carry Statute indicates the legislature meant to avoid.

¶67 This analysis also indicates the Rule fails the third Anchor test. The Concealed-Carry Statute's evident purpose is to allow the carrying of concealed weapons as broadly as possible, subject only to limited exceptions identified by the statute itself. This breadth, coupled with the assurance that

only the legislature can add new restrictions, allows individuals to move about the entire state with confidence they are not violating the law. If it were otherwise, people traveling the interstate with a concealed weapon might find themselves compliant as they drive through a carry-philic town, only to find themselves law-breakers a moment later as they pass into an adjacent carry-phobic community. In practice, this would mean (for example) that the municipality along the Madison-Milwaukee corridor with the most restrictive weapon regulation would effectively set the concealed-carry standard for everyone traveling between the two cities. This would certainly defeat the Concealed-Carry Statute's purpose in creating a uniform standard for the entire state.[45]

¶68 In sum, the City may not enforce the Rule against concealed-carry licensees who are in compliance with the Concealed-Carry Statute.

---

[45] There are, of course, certain and well-defined places one may not carry a concealed weapon, e.g., jails, mental health institutions, courthouses, etc. See Wis. Stat. § 175.60(16)(a). The nature of these exceptions reinforces the uniformity inherent in the Concealed-Carry Statute. The common thread running through each is that they describe places where there are obvious and elevated security concerns. This statute is exactly what one would expect of a law aimed at maximizing statewide uniformity while simultaneously controlling for legitimate security concerns.

IV. CONCLUSION

¶69 We hold today that the Local Regulation Statute, Wis. Stat. § 66.0409, has withdrawn authority from the City to regulate, either through its governing body or its sub-units (and without regard to the label it affixes to its regulation or manner of regulating), the subjects identified in the Local Regulation Statute in a manner that is more stringent than an analogous state statute. We also hold that the Concealed-Carry Statute, Wis. Stat. § 175.60, preempts the City's authority to restrict a licensee's right to carry concealed weapons on the City's buses so long as the licensee complies with the statute's requirements. Finally, we hold that neither the City nor any of its sub-units or employees may enforce the Rule to the extent it purports to prohibit carrying any knife or firearm (as defined by the Local Regulation Statute) or weapon (as defined by the Concealed-Carry Statute), so long as such carrying is not forbidden by (and is done in compliance with) the Vehicle Statute, Wis. Stat. § 167.30, the Concealed-Carry Statute, and all other statutes that may from time to time become applicable.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

Appendix A

# METRO POLICY DOCUMENT:

## Rules of Conduct and Inappropriate Conduct Transit Exclusion Procedure



**Metro Transit**
Chuck Kamp, General Manager
1245 East Washington Avenue, Suite 201 | Madison, WI 53703
Administration: (608) 266-4904 | Customer Service: (608) 266-4466
mymetrobus@cityofmadison.com | www.mymetrobus.com

7:11:2016-Rules of Conduct & Inappropriate Conduct Procedure.doc

**IV. LEVEL II INAPPROPRIATE CONDUCT ON BUSES OR IN OTHER FACILITIES**

The following conduct is prohibited in all Metro facilities, including but not limited to, buses, Transfer Points, park & ride lots, and bus shelters except as specifically limited below. Any individual observed engaging in the conduct may be told by a Bus Operator or Supervisor or other authorized individual to leave the facilities immediately and may be subject to arrest by proper authorities. The Bus Operator is authorized to request police assistance if necessary. These offenses may also subject passenger(s) to the Exclusion Procedure, described in Section VI; further legal action may be taken as applicable and appropriate.

- Smoking on buses. (See Section V below concerning lighting an incendiary device (e.g. match, lighter, or torch).
- Fighting.
- Bringing any items of a dangerous nature on-board buses including: weapons (pistols, rifles, knives or swords); flammable liquids; dangerous, toxic or poisonous substances; vessels containing caustic materials, chemicals, acids or alkalis; fishing rods which are not broken down or have unsecured or exposed hooks or lures, ski poles unless secured to skis or have tip covers; sheet glass and sharp objects. Fencing foils must be sheathed and left at the front of the bus with the bus operator.
- Behavior that is disruptive, harassing, or threatening in nature to Metro passengers or employees. This includes following or stalking passengers or employees.
- Causing sounds that are unreasonable and highly disruptive of other individuals using Metro facilities or services, including but not limited to: prolonged loud, , abusive, indecent, profane or drunken conduct.
- Misuse of fare media.
- Drinking alcoholic beverages or possessing open containers of alcoholic beverages.
- Otherwise disorderly or inappropriate conduct which is inconsistent with the safe and orderly use of transit facilities for their intended purpose.

**V. LEVEL III INAPPROPRIATE CONDUCT/EMERGENCY SITUATIONS**

The following conduct in all Metro vehicles and facilities, including buses, Transfer Points, Park and Ride Lots and bus shelters will be cause for police intervention, arrest and/or prosecution. An emergency situation can be defined as any situation in which an individual's actions present an imminent danger to the life or safety of him/herself or others, or to Metro property. The Bus Operator is authorized to request police assistance. An individual found to have engaged in any of the following activities will be excluded from transit facilities and/or services pursuant to the process in Section VI, Exclusion Procedure.

- Use of counterfeit or stolen fare media
- Assault or threat of assault.
- Stealing or willfully damaging, defacing or destroying Metro property. The City will prosecute anyone who steals or willfully damages, defaces or destroys Metro property.
- Lighting an incendiary device (e.g. match, lighter, torch).
- Obstructing or interfering with the Bus Operator's safe operation of the bus
- Indecent exposure
- Entering or remaining on Metro buses after having been notified by an authorized individual not to do so, or boarding or remaining on Metro buses during the period when an individual has been banned from the premises. See NON-COMPLIANCE WITH EXCLUSION ORDER (XIII).



# RIDE GUIDE

V2—Effective August 2016

## Check your trip!
## Updated schedules & maps on several routes.

**Plan your trip:**
*mymetrobus.com*
(608) 266-4466

## Step 4. Catch Your Bus!

### Waiting for the Bus

Arrive at the bus stop at least five minutes before your scheduled stop. Check for your route number on the sign. Metro has three types of bus stops diagramed below.

Make sure you are waiting at the correct location and your stop is appropriate for the direction the bus is traveling. **Wave to the driver when you see your bus approaching.**

**Never run after a departing bus.** For your safety, buses will not load passengers after they pull away from a stop or transfer point loading area.

**Smoking is *not* allowed inside bus shelters.**

## Where to Wait!



**Wait at Sign!**
Bus stop is past the intersection—wait at sign.



**Wait at Corner!**
Bus stop is before the intersection—wait at corner.
(The back of these signs direct you to board the bus at corner.)



**Wait at Sign!**
Bus stop is in the middle of the block—wait at sign.

### Destination Signs

To ensure you're boarding the correct bus, check the



vehicle route number and destination on the sign above the windshield. If a route is traveling on a certain street, "via" will flash after the route name.

### Passenger Conduct

*For the safety and comfort of all riders:*

1. Save front seats for seniors and people with disabilities.
2. Hold handrails when boarding, walking, or standing inside the bus.
3. No smoking (includes e-cigarettes), eating, drinking or littering.
4. Shoes and shirt required to board.
5. Roller blades and/or roller skates are not allowed on buses or at transfer points.
6. Use earphones when listening to portable devices. Volume should be set to level that won't disturb others.
7. Do not stand in front of the yellow/white line at front of the bus.
8. No animals allowed, except service animals or caged pets that fit on your lap.
9. No weapons allowed of any kind.
10. Aisles must be kept clear. Large items must be stored on your lap, or under or between seats. Items that are too large to be stored out of the aisle are not allowed.
12. Remove children from strollers and fold during ride.
13. Vulgar language, boisterous behavior and fighting are not allowed.
14. Items of a dangerous nature are not allowed. Those could include but are not limited to: flammable liquids; dangerous, toxic or poisonous substances; storage batteries; vessels containing caustic materials, chemicals, acids or alkalis; fishing rods which are not broken down or have unsecured or exposed hooks or lures; ski poles unless secured to skis or have tip covers; sheet glass and sharp objects.
15. No refillable high-pressurized containers allowed (except personal oxygen tanks as allowed under the ADA).
16. Do not have distracting conversations with drivers.
17. Repeated or serious incidents of inappropriate conduct may lead to exclusion from transit service. For more information: mymetrobus.com/conduct.

### Exiting the Bus

Use touch strip or pull cord to signal driver one block in advance. Remain seated until bus comes to complete stop. Exit through the rear door.

**Note on automated announcements:** Don't wait for announcements to signal your stop. Recorded announcements signal the location of the bus and are timed to play when the bus is passing a location (not approaching it).

**6**

¶70 ANN WALSH BRADLEY, J. *(dissenting).* The public policy and safety considerations involved in allowing weapons on a city bus may be hotly debated, but those issues are not before the court. Nor is the complexity of the constitutional right to bear arms at issue here. This case presents a straightforward question of statutory interpretation.

¶71 The issue here is whether Wis. Stat. § 66.0409 preempts a rule adopted by the City of Madison's Transit and Parking Commission that prohibits a person from traveling on a city bus with a weapon (the "bus rule").

¶72 Judicial restraint requires that courts "assume that the legislature's intent is expressed in the statutory language" chosen by the legislature. State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. And that is exactly what the circuit court and a unanimous court of appeals did here.

¶73 Applying a plain meaning interpretation, both courts determined that the bus rule is not preempted by state statute. They concluded that the plain meaning of Wis. Stat. § 66.0409 (the "Preemption Statute") clearly limits preemption to municipal "ordinances" and "resolutions" enacted or adopted by a "city, village, town or county." See Wis. Stat. § 66.0409(1)(b) & (2).[1] Further they determined the bus rule is neither an

---

[1] The majority opinion refers to this same statute as the "Local Regulation Statute." Like the court of appeals, I use the term "Preemption Statute."

1

"ordinance" nor a "resolution," and it was not enacted by the city.  That should be the end of the analysis.

¶74  A majority of this court, however, fails to exercise the same restraint.  Discarding seminal rules of statutory interpretation, the majority slips into legislative mode, and ignores the plain meaning of the words chosen by the legislature.  It rewrites the statute in a manner it wishes the legislature had chosen, a manner chosen by several other states——but not Wisconsin.

¶75  The majority evinces a further lack of judicial restraint when it reaches out to address constitutional issues not raised or briefed by the parties.

¶76  Contrary to the majority, I agree with the circuit court and the court of appeals that the legislature meant what the words of the statute clearly provide.  The rule adopted by the City of Madison's Transit and Parking Commission that prohibits a person from traveling on a city bus with a weapon is not preempted by state statute.

¶77  Accordingly, I respectfully dissent.

I

¶78  As a harbinger of things to come, the majority begins its analysis not with the statute to be examined, but with a discussion of the Second Amendment of the United States Constitution, examining the constitutional right to bear arms. Majority op., ¶¶8-12.

¶79  Cases that turn on statutory interpretation generally begin the analysis by setting forth the text of the statute.

2

For example, in the first paragraph of its analysis, the petitioner's brief sets forth the relevant statute in full. Following suit, the City likewise presents front and center the statute to be examined, setting it forth in full in the second paragraph of the brief's analysis. But where is the Preemption Statute set forth in full in the majority's analysis? Nowhere.

¶80 This omission underscores that the majority's statutory interpretation is less about the text of the statute and more about lengthy and intertwining legal arguments. The absence obscures the ability to compare the plain text of the statute with the majority's interpretation of it. Wisconsin's Preemption Statute, Wis. Stat § 66.0409(2), provides:

> [With exceptions not relevant here], no political subdivision may enact or enforce an ordinance or adopt a resolution that regulates the sale, purchase, purchase delay, transfer, ownership, use, keeping, possession, bearing, transportation, licensing, permitting, registration or taxation of any knife or any firearm or part of a firearm, including ammunition and reloader components, unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute.

Additionally, Wis. Stat. § 66.0409(1)(b) defines "political subdivision" as "a city, village, town or county."

¶81 It is noteworthy that when the majority does reach the issue actually before this court, it claims to be engaging in a plain meaning interpretation. Yet, its plain meaning interpretation does not come close to tracking the words of the statute it is examining.

¶82 The majority determines that "the plain meaning of the [Preemption] Statute is that the legislature withdrew from the

City's governing body all authority to legislate on the . . . 'possession, bearing [or] transportation . . . of any knife or any firearm' unless the legislation is 'the same as or similar to, and no more stringent than, a state statute.'" Majority op., ¶28 (citation omitted).

¶83 In reaching this "plain meaning" interpretation of the statute the majority discards seminal rules of statutory interpretation, slips into legislative mode, and re-writes the statute the way it wishes the legislature would have written it. I address each in turn.

A

¶84 Although it pays lip service to seminal rules of statutory interpretation set forth in Kalal, 271 Wis. 2d 633, one wonders what is left of those rules after reviewing the majority's truncated exposition of a plain meaning interpretation.

¶85 When Kalal was decided, essentially two approaches to statutory interpretation had evolved. One approach was more holistic and inquired what was meant by the statute. Another focused on the words of the statute chosen by the legislature and instructed that the words be given their plain meaning. The majority in Kalal adopted the latter textual approach.

¶86 Curiously, the majority in this case appears to backtrack from the majority's approach in Kalal. Rather than inquire what the text does provide, the majority here asks what does the statute mean. It even supplies emphasis in the original, underlying "meaning" as an apparent shorthand signal

4

of a reinvigorated holistic approach. Majority op., ¶20. After explaining that to be bound by the words of the statute chosen by the legislature would render it a mechanical and mere "arbiter[] of word choice," the majority emphasizes "[i]t is, instead, the 'plain meaning' of a statute we must apply." Id., ¶¶19-20.

¶87 In the majority's search for meaning, it discards seminal rules of statutory interpretation that emphasize the primacy of the words chosen by the legislature. Brushed aside are rules that require an interpretation using the statutory common and ordinary meaning of those chosen words as well as an examination of those words in the statutory context in which they are used. The majority's departure from these seminal rules includes those set forth below.

¶88 First, "Judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute." Kalal, 271 Wis. 2d 633, ¶44. As noted above, the majority asserts that it is not the words of the statute that are significant, but the "plain meaning" of a statute that must be applied. Majority op., ¶20.

- "We must, however, keep in mind that this axiom [to apply the plain meaning of the statute] does not reduce the judicial function to mechanically comparing the words of a statute to the name given a legislative enactment, or the body enacting it." Majority op., ¶19.

- "We are not merely arbiters of word choice. If we were, we would need do nothing more than confirm that 'rule' is a word different from 'ordinance' and 'resolution,' and

5

that 'commission' is etymologically distinct from 'city,' 'village,' 'town,' and 'county.'" Id., ¶19.

¶89 Second, "statutory interpretation begins with the language of the statute." Kalal, 271 Wis. 2d 633, ¶45 (internal quotations and citations omitted). The majority opinion does not set forth the full text of the statute anywhere in its statutory analysis, which obscures a comparison to the text of the statute with the majority's "plain meaning" interpretation of it. Rather than beginning its analysis with the language of the statute, it begins with a discussion of the Second Amendment. Majority op., ¶¶8-12.

¶90 Third, "[s]tatutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Kalal, 271 Wis. 2d 633, ¶45. Although the majority accurately quotes Cross v. Soderbeck, 94 Wis. 2d 331, 342, 288 N.W.2d 779 (1980), which defines the common and ordinary meaning of both "ordinance" and "resolution," it declines to apply the common and ordinary meaning to those terms.[2] Majority op., ¶¶24-28.

---

[2] Cross v. Soderbeck, 94 Wis. 2d 331, 342, 288 N.W.2d 449 (1980) (citations omitted) provides:

A municipal ordinance or by-law is a regulation of a general, permanent nature, enacted by the governing council of a municipal corporation. . . . A resolution, or order as it is sometimes called, is an informal enactment of a temporary nature, providing for the disposition of a particular piece of the administrative business of a municipal corporation. . . . And it has been held that even where the statute or municipal charter requires the municipality to act by ordinance, if a resolution is

(continued)

6

¶91 Instead, the majority superimposes on <u>Kalal</u> a new approach. It creates alternative interpretive principles, including examining the ordinance's "taxonomy functionally." Majority op., ¶25. Ultimately, it arrives at a plain meaning interpretation based on these principles.

- The majority "derive[s] three principles useful to our inquiry": (1) "ordinances are municipal legislative devices, formally enacted, that address general subjects in a permanent fashion"; (2) "resolutions are those informal municipal legislative acts that address particular pieces of administrative business in a temporary fashion"; and (3) "the label given to a legislative device is not dispositive——one identifies the device's taxonomy functionally." Majority op., ¶25.

- "Thus, the plain meaning of the [Preemption] Statute is that the legislature withdrew from the City's governing body all authority to legislate on the subjects it identifies . . . ." <u>Id.</u>, ¶28.

¶92 Fourth, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." <u>Kalal</u>, 271 Wis. 2d 633, ¶46. The majority does not analyze the statutory context or language of closely-related statutes. Instead, it analyzes the result and reasons that the result is not what the legislature intended.

- "We examine the statute's contextualized words, put them into operation, and observe the results to

---

passed in the manner and with the statutory formality required in the enactment of an ordinance, it will be binding and effective as an ordinance.

7

ensure we do not arrive at an unreasonable or absurd conclusion." Majority op., ¶20.

¶93 The process that the majority employs in its plain meaning interpretation is one that is almost entirely disconnected from the actual language of the statute. Ultimately, it is apparent that in abandoning or reconfiguring seminal rules of statutory interpretation, the majority fails to honor the words chosen by the legislature.

B

¶94 Instead the majority dons its collective legislative hat and rewrites the Preemption Statute in a manner chosen by several other states——but not Wisconsin. The Wisconsin legislature could have, but did not, use expansive language intended to more broadly prohibit local agency regulation of firearms. In re Incorporation of Portion of Town of Sheboygan, 2001 WI App 279, ¶9, 248 Wis. 2d 904, 637 N.W.2d 770 ("It is presumed that the legislature is cognizant of what language to include or omit when it enacts laws.").

¶95 Other jurisdictions provide examples of how the Wisconsin legislature could have more broadly written its preemption statute. For example, in Kansas, the preemption statute prohibits the adoption of ordinances and resolutions, but also says that "no agent of any city or county shall take any administrative action" to regulate firearms. Kan. Stat. Ann. § 12-16,124(a) (2013).

¶96 A multitude of other states have done exactly what the Wisconsin legislature did not do, but what the majority wishes this legislature had done. See Va. Code Ann. § 15.2-915A (2012)

8

(no agent of any locality "shall take any administrative action . . . "); Tenn. Code Ann. § 39-17-1314(a) (2014) (no city "shall occupy any part of the field of regulation . . . "); Mich. Comp. Laws § 123.1102 (2015) (no city shall "enact . . . any ordinance . . . or regulate in any other manner"); Ark. Code Ann. § 14-16-504(b)(1)(A) (2011) (local governments "shall not enact any ordinance or regulation pertaining to, or regulate in any other manner . . . "); Fla. Stat. § 790.33(1) (2011) (preempting "any administrative regulations or rules"); Idaho Code § 18-3302J(2) (2014) ("no [] city, agency, board or any other political subdivision . . . may adopt or enforce any law, rule, regulation, or ordinance, which regulates in any manner . . . "); Ky. Rev. Stat. Ann. § 65.870(1) (West 2012) (prohibiting a ban by "any person acting under the authority of any . . . organization[] . . . ").

¶97 The majority ultimately justifies its creative approach to statutory interpretation by emphasizing a desire to avoid an absurd result. Majority op., ¶46 n.31. However, it appears that the majority may be confusing a desire to avoid an absurd result with reaching a statutory interpretation it desires.

II

¶98 Contrary to the majority, I begin as our case law instructs, with the plain language of the statute. Kalal, 271 Wis. 2d 633, ¶45 ("[S]tatutory interpretation begins with the language of the statute.") (internal quotations and citations omitted). "If the meaning of the statute is plain, we

9

ordinarily stop the inquiry." Id. We give statutory language its common, ordinary, and accepted meaning. Id. (citations omitted). Technical or specially-defined words or phrases are given their definitional meaning. Id. "[L]egislative history is sometimes consulted to confirm or verify a plain-meaning interpretation." Id., ¶51 (citation omitted).

¶99 I agree with the City, the circuit court and a unanimous court of appeals that the statute plainly preempts only "ordinances" and "resolutions." Wisconsin Stat. § 66.0409(2) provides that "no political subdivision may enact or enforce an ordinance or adopt a resolution" that regulates the bearing of any firearm unless it is no more stringent than a statute:

> [With exceptions not relevant here], no political subdivision may enact or enforce an ordinance or adopt a resolution that regulates the sale, purchase, purchase delay, transfer, ownership, use, keeping, possession, bearing, transportation, licensing, permitting, registration, or taxation of any knife or any firearm or part of a firearm, including ammunition and reloader components, unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute.

¶100 The bus rule is not an "ordinance" or "resolution." A municipal "ordinance" is "a regulation of a general, permanent nature, enacted by the governing council of a municipal corporation . . . " Cross, 94 Wis. 2d at 342. A "resolution" is an "informal enactment of a temporary nature, providing for the disposition of a particular piece of the administrative business of a municipal corporation." Id.

10

¶101 The meaning of the statute is plain and our inquiry may stop here.  See Kalal, 271 Wis. 2d 633, ¶45.  However, we also look to legislative history to confirm our plain meaning interpretation.  Id., ¶51.  Absent from the majority opinion is any discussion of the legislative history of the Preemption Statute.  Likely it is absent because it supports an interpretation completely at odds with the majority's statutory interpretation.

¶102 As Justice Prosser's concurrence in State v. Cole, 2003 WI 112, ¶¶60-64, 264 Wis. 2d 520, 665 N.W.2d 328, explained, the Preemption Statute was enacted in 1995 to address gun control ordinances proposed by the cities of Milwaukee, Kenosha, and Madison.  In response to these proposed ordinances, Representative DuWayne Johnsrud introduced legislation "to preempt municipalities from enacting gun control ordinances that were stricter than state law."  Id., ¶64 (emphasis added).

¶103 Looking at how other states have interpreted similar statutory language also confirms our plain meaning interpretation.  The Oregon court of appeals decision in Doe v. Medford Sch. Dist. 549C, 221 P.3d 787 (2009) is instructive because of Oregon's analogous Preemption Statute, which prohibits only ordinances.[3]  The Medford court reasoned that "the

---

[3] Oregon's Preemption Statute, Or. Rev. Stat. § 166.170(2) (2016), provides:

Except as expressly authorized by state statute, no county, city or other municipal corporation or district may enact civil or criminal ordinances, including but not limited to zoning ordinances, to regulate, restrict or prohibit the sale, acquisition,

(continued)

11

legislature intended the term 'ordinance' to refer to the equivalent of a law or other enactment of a municipal corporation that carries the force of law and is enforceable against the public generally."  Id. at 792.  Thus, Medford determined that a school district could issue a policy barring district employees from bearing arms on school district property despite its preemption statute, because it was not enforceable against the general public.  Id. at 799.

¶104 Similar to the school district policy in Medford, the bus rule is not a generally-applicable legislative enactment like an ordinance.  Bus policies are limited in scope and apply only to members of the public who choose to ride a Madison Metro bus.  See also John E.D. Larkin, Guns in Government Parks & Buildings——Municipal Enforcement of Safety Rules Without Running Afoul of State Preemption, 86 Pa. B. Ass'n Q. 128, 137 (July 2015) ("government conduct does not rise to the level of 'regulation' when the government acts in its capacity as a private owner."); Wolfe v. Twp. of Salisbury, 880 A.2d 62, 69 (Pa. Commw. Ct. 2005) (township could ban hunting, despite a statewide preemption statute, in township parks because the township did not act to regulate hunting throughout the municipality, but only on its own property).  Like in Medford, the bus rule here is appropriately based on the agency's limited

---

transfer, ownership, possession, storage, transportation or use of firearms . . . Ordinances that are contrary to this subsection are void.

12

authority because it applies only to persons who choose to ride a Madison Metro bus, rather than to the general public.

¶105 Contrary to the majority, I conclude that the plain meaning of Wisconsin's Preemption Statute does not clearly preempt the bus rule. This plain meaning interpretation is confirmed by the legislative history and informed by examining the interpretation given to similar language.

¶106 Additionally, the plain meaning interpretation set forth in this dissent is consistent with that previously rendered by the Wisconsin Attorney General. It is conspicuous by its absence from the majority's analysis. After the Vehicle Statute was amended, see 2011 Wis. Act 35, § 31, the Attorney General opined that "public and private entities may prohibit or restrict the possession and transport of weapons."[4] I agree.

### III

¶107 Having determined that the legislature meant what it said in the text of the Preemption Statute, the statutory interpretation exercise may come to an end. Accordingly, there is no need to address whether the bus rule is more stringent than state law, when it is not preempted by state law. I pause, however, to briefly comment on the observation set forth at the outset of this dissent.

---

[4] Wisconsin Department of Justice, Wisconsin's Carrying Concealed Weapon Law Questions and Answers 45 (June 1, 2013), https://www.doj.state.wi.us/sites/default/files/dles/ccw/ccw-faq.pdf.

¶108 The majority strays far afield from the question of statutory interpretation presented here by beginning its analysis with a discussion about the right to bear arms under the Second Amendment to the United States Constitution. Majority op., ¶¶8-12. It contends that this summary discussion of the Second Amendment provides context and background for the statutory analysis. Id., ¶8 n.10.

¶109 However, both parties repeatedly advised the court that this case, as presented, has nothing to do with the constitutional right to bear arms. The parties intentionally and strategically framed this case as a case of statutory interpretation only. Nevertheless, the majority evinces a further lack of judicial restraint when it reaches out to address constitutional issues not raised or briefed by the parties.

¶110 A litany of refrains makes clear that it is the position of the parties that the constitutional right to bear arms is not implicated here, either under the United States Constitution or the Wisconsin Constitution. Counsel for Wisconsin Carry repeatedly stated:

- " . . . We could have brought that issue (the constitutional right to bear arms on a city bus), we didn't. I am not here today to argue it."

- "We did not raise any constitutional issues in this case."

- "No, we did not raise any constitutional issues."

14

- "We did not bring any state or federal constitutional issues in th[is] case."

Counsel for the City agreed:

- "Well there's a reason the petitioners didn't raise any constitutional issues in this case. And one of them is [that] the Vehicle Statute has been in play since before Act 35."

- "There [have] been no constitutional issues in this case."

¶111 Undaunted by counsel's protestations to the contrary, the majority embarks on a discussion of the Second Amendment. It observes the "extensive textual and historical analysis" employed by the court in D.C. v. Heller, 554 U.S. 570, 592 (2008), and notes that the Wisconsin Constitution has very distinctive language from that contained in the United States Constitution. Majority op., ¶10. Without any analysis, the majority then declares that the Wisconsin right to bear arms is also fundamental and is an "individual right." Id.

¶112 The lack of nuance in the majority's declaration underscores the folly in reaching out to discuss constitutional issues not presented, briefed or argued. For example, the majority's discussion of a "pre-existing" fundamental right may suggest that such a right is absolute. See majority op., ¶9. However, as counsel for the City stated at oral argument, the Second Amendment right to bear arms "is not an absolute right. It's subject to reasonable restrictions. And for years, the State had a restriction against carrying guns in vehicles and

15

it's been articulated in cases what the safety reasons for that [are]."

¶113 In <u>Heller</u>, the United States Supreme Court explained "[l]ike most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. The <u>Heller</u> court further observed that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Id.</u> (citations omitted).

¶114 This is the same lack of nuance that Justice Prosser warned against in <u>Cole</u>, 264 Wis. 2d 520, ¶¶60-79, (Prosser, J., concurring), which was the first time our court interpreted the new Wisconsin Constitutional Amendment on the right to bear arms. Justice Prosser explained that the amendment requires a "nuanced interpretation." <u>Id.</u>, ¶60. Tracing the legislative history and changes in the text of the proposed amendment as it worked its way through the initial legislative process, he made clear that merely labelling the right "fundamental" was insufficient. <u>Id.</u>, ¶¶60-79.

¶115 Justice Prosser's concurrence in <u>Cole</u> cautioned that the Second Amendment right to bear arms in the Wisconsin Constitution "is not a fundamental right in the same sense that freedom of speech, freedom of worship, the right to remain silent, and the right to a jury trial are <u>fundamental</u> rights." <u>Id.</u>, ¶79. Additionally, the concurrence emphasized the need for nuance when examining the individual nature of the

16

constitutional right. It clarified that the choice of the wording "the people" at the beginning of the amendment to the Wisconsin Constitution was intended to de-emphasize the nature of the individual right:

> First, although the legislature wanted to establish a right that would benefit hundreds of thousands of individual gun owners, it wanted to deemphasize the 'individual' nature of this right. The original amendment provided that '<u>Every individual, except an individual restricted in accordance with federal law,</u> has the right to keep and bear arms . . . but the manner of bearing arms may be regulated []' . . . By removing this limiting clutter from the draft, the legislature removed any impediment to a reasonable exercise of the police power. By shifting the right from 'Every individual' to 'The people,' the amendment underlined the fact that the police power in Wisconsin may reasonably restrict specific individuals and classifications of people (<u>e.g.</u>, domestic abusers, minors) in ways that it may not restrict the people as a whole.

<u>Id.</u>, ¶77.

¶116 The majority's far reaching constitutional discussion also tackles the Wisconsin Home Rule Amendment, art. XI, § 3, although neither party briefed or argued the issue.[5] In fact neither party even cites it in passing in their briefs.

---

[5] Wisconsin's Home Rule Amendment provides in relevant part:

> Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature.

Wis. Const. art. XI, § 3(1).

17

Admittedly, the non-party amicus does cite to this constitutional provision, but then clarifies that "[i]n creating the [bus] Rule, Madison did not rely upon the Home Rule Amendment, so the issue is whether the Rule is preempted under statutory [not constitutional] home-rule analysis."

¶117 Having raised the Home Rule Amendment, the majority then fails to consider the amendment when analyzing the scope of municipal authority. Perhaps as a result, the majority makes some broad statements about the scope of authority of municipalities without nuance or substantiation.

¶118 The majority's broad statements appear to sub silentio eviscerate the constitutional potency of the Home Rule Amendment. For example, it proclaims that "if the City has no legislative authority with respect to that subject, it necessarily has nothing to delegate to its divisions." Majority op., ¶23; see also id., ¶28 ("Because a municipality cannot delegate what it does not have, the City is entirely powerless to authorize any of its sub-units to legislate on this subject.").

¶119 Adopted in 1924, the Home Rule Amendment was meant to give local government significant powers separate from those bestowed through legislative enactments. Because Home Rule powers derive from the Wisconsin Constitution and not from the Wisconsin legislature, there are limits on the legislature's ability to circumscribe municipal authority through legislative enactments. Yet, the majority's analysis fails to account for such possible limitations.

18

IV

¶120 For the reasons set forth above, I conclude that the Preemption Statute does not apply to the bus rule because it is not an ordinance or resolution enacted by the City. Judicial restraint requires that this court "assume that the legislature's intent is expressed in the statutory language" chosen by the legislature. See Kalal, 271 Wis. 2d 633, ¶44. "It is the enacted law, not the unenacted intent, that is binding. . . . " Id.

¶121 Accordingly, I respectfully dissent.

¶122 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.